John K. FLASZA, Plaintiff,

v.

TNT HOLLAND MOTOR EXPRESS, INC., a Michigan corporation, Defendant.

No. 93 C 7315.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 27, 1994.

Donald S. Rothschild, Mark C. Gross, Goldstine, Skrodzki, Russian, Nemee & Hoff, Ltd., Summit, IL, for plaintiff.

A. Read Cone, III, Dean & Fulkerson, P.C., Troy, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

John K. Flasza sues TNT Holland Motor Express ("TNT") for discrimination in a termination decision under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, Illinois common law, and the Illinois Workers' Compensation Act, 820 ILCS 305/4. TNT moves for summary judgment on all claims.

### BACKGROUND [1]

■ TNT is an interstate trucking company that is based in Holland, Michigan, but operates a terminal facility in McCook, Illinois. Vandevusse Aff. ¶¶ 2–4. Three types of dock workers are employed at the McCook terminal facility. "Casual" or "extra" dock workers work on a daily basis and are guaranteed eight hours of work per day. Def. Mem., Ex. 1, art. 4. They are considered employees under the collective bargaining agreement and are paid on a weekly basis. *Id.* at art. 5. The second category of dock employees are probationary employees. These employees become seniority employees if they remain employed after a thirty-day probationary period. Vandevusse Aff. ¶ 7. The final type of dock employee is a seniority employee. *Id.* at 8.

In July 1992, Flasza sought employment at TNT's McCook terminal facility after voluntarily leaving his previous employer. Flasza Aff. ¶ 2; Pl. 12(n), Ex. D, p. 1. TNT immediately hired Flasza as a casual dock worker and told him to submit to a physical examination and drug test at a specified doctor. Flasza Aff. ¶ 4. Flasza passed his physical and drug test. Def.Mem., Ex. 2. The "health history" section of the physical examination report is a series of "yes/no" boxes for 18 classes of ailments. Every box is checked "no" on the report, including those for "extensive confinement by illness or injury" and "permanent defect from illness, disease, or injury." *Id.* On July 16, Flasza completed a TNT employment application form that qualified his signature with the following statement: "I also understand that

misrepresentation or omission of information or facts may result in my rejection or dismissal." TNT also informed Flasza that it would shortly conduct a background check of his employment and credit history.

Flasza worked for TNT six days a week from July 17 through August 21, 1992. Flasza was never criticized for his job performance; supervisors occasionally told Flasza that he was doing a good job. Flasza Aff. ¶ 10. On August 21, TNT terminated Flasza without warning. *Id.* Flasza immediately inquired about the reason he was terminated. A supervisor told him that the decision came from the Michigan office and that he should direct his inquiries there. *Id.* at 12. Flasza made at least one oral request and two written requests sent by certified mail to TNT's Michigan office. Pl. 12(n), Exs. J, K, L. TNT ignored the requests. Flasza ¶ 12. Flasza then filed a complaint with the Illinois Department of Labor under the Illinois Personnel Records Review Act. *Id.* TNT still refused to disclose Flasza's employment file. Finally, the Illinois Department of Labor issued a subpoena for the records. Pl. 12(n), Ex. P.

Flasza's employment file contained little information on his dismissal. The file did include a report from TNT's employee background investigator, Robert Arden & Associates, Inc. ("the Arden report"), *containing* the results of its background check on Flasza. The Arden report included favorable comments from Flasza's previous employers, a favorable credit history, and no criminal history. But the report also disclosed that Flasza had filed five workers' compensation claims against his former employer, most recently in early 1984. Pl. 12(n), Ex. D. The only other item in Flasza's employment file relevant to his discharge was a memorandum from Stacey Fitts (now Stacey Vandevusse), the person responsible for Flasza's employment decision, to the McCook terminal facility. The memorandum states in total: "Don—Based on our findings, this person does not meet our criteria. /s/ Stacey." Pl. 12(n), Ex. I.

---

Accordingly, the court may not consider Flasza's deposition testimony since it is not part of the record.

Flasza filed a discrimination charge with the Equal Opportunity Employment Commission ("EEOC") in Chicago on May 12, 1993. The Chicago office transferred the charge to the EEOC's Detroit office. The Detroit office referred the charge to the Michigan Department of Civil Rights, which returned Flasza's charge for want of jurisdiction on September 28, 1993. The Detroit office issued Flasza a notice of right to sue on November 4, 1993. Flasza filed this suit on December 3, 1993. Count I of the complaint alleges that TNT violated the ADA by discharging Flasza because of a perceived disability. Count II alleges that TNT discharged Flasza because he had filed workers' compensation claims against a previous employer. Count III alleges a statutory cause of action under the Illinois Workers' Compensation Act, 820 ILCS 305/4.

### DISCUSSION

■ TNT moves for summary judgment under Fed.R.Civ.P. 56. A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of Am.* 8 F.3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1075,

127 L.Ed.2d 393 (1994). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993); *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir. 1992).

### I. *Americans With Disabilities Act*

■ Count I charges TNT with an ADA violation. To prevail on his ADA claim, Flasza must prove that he was discriminated against because of a disability. *See* 42 U.S.C. § 12112.[2] Flasza may meet his burden in one of two ways. First, Flasza may use direct evidence to demonstrate that he was discharged because he is disabled. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 371 n. 2 (7th Cir.1992); *Kotarski v. Binks Mfg. Co.,* 837 F.Supp. 247, 249–50 (N.D.Ill.1992). Direct proof may include discriminatory remarks or actions by the employer's decisionmaker, as well as circumstantial evidence, such as the failure of an employer to employ any disabled individuals. *Cf. Perfetti v. First Nat'l Bank,* 950 F.2d 449, 450 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992). Flasza proffers no direct evidence that he was fired because of a disability. Flasza does not proffer discriminatory remarks or actions by his employer. Indeed, Flasza complains that he was unable to obtain any explanation for his termination from TNT and that his official file contained only one vague sentence about not meeting "criteria."

■ Direct evidence of employment discrimination is rare. Flasza may prove his discrimination claim through use of the burden-shifting method established for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See DeLuca v. Winer Indus.,* 1994 WL 374197, *4–5, 1994 U.S. Dist. LEXIS 9467, *14 (N.D.Ill.) (applying *McDonnell Douglas* test in ADA context); *Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp.

---

2. Because the standards under the ADA, the Age Discrimination in Employment Act, and Title VII are identical, the following discussion relies on cases decided under all three statutes.

1310, 1318 (E.D.Pa.) (same). This rubric allows a discharged plaintiff to establish a *prima facie* case of disability discrimination by showing (1) that he is within the protected class; (2) that he was performing according to the employer's legitimate expectations; (3) that he was terminated; and (4) that the employer replaced him with someone not in the protected class. *DeLuca,* 1994 WL 374197 at *4–5 & n. 7, 1994 U.S. Dist. LEXIS at *14 & n. 7; *Doe,* 862 F.Supp. at 1318; *see also Notaro v. Digital Equipment Corp.,* 1994 WL 457231, 1994 U.S. Dist. LEXIS 11659 (N.D.Ill.). A plaintiff satisfying these elements shifts the burden of production to the defendant, who must articulate legitimate and nondiscriminatory reasons for the discharge. *McCoy,* 957 F.2d at 371. If the defendant articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the employer's proffered reasons could be a pretext for discrimination. *Id.* A plaintiff establishes pretext by showing that the employer's reasons are unworthy of credence or that the decision to terminate was more likely than not motivated by discriminatory reasons. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Oxman v. WLS–TV,* 846 F.2d 448, 456 (7th Cir.1988).

■ Flasza does not make out a *prima facie* case because he is not a member of the protected class. The ADA proscribes discrimination against a "qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). "Disability" is defined as (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102. Federal regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Flasza must show that he is an "individual with a disability" to fall within the class protected by the ADA. He concedes, however, that he is not actually disabled:

At no time since July, 1992 through present have I suffered from an "permanent defect from illness, disease or injury." Both my Charge of Discrimination and my Complaint in this matter are based upon the assertion that TNT Holland *perceived* me as being "disabled" as defined under the American [sic] with Disabilities Act, and not that I am in fact suffering from a disability. At all times during my employment with TNT Holland (and presently), I possessed all of my limbs and body parts; and the percentage "losses" set forth in the [Arden report] only reflect the language utilized in the settlement contracts entered into on my behalf by my workers [sic] compensation attorneys and the attorneys representing [my previous employer's] insurance company.

Flasza Aff. ¶ 8.

Although Flasza limits his claim to TNT's perceptions, Flasza argues that he is within the protected class under both the second and third definitions of disability. Under the second definition, a person is disabled if the person has a "record" of an impairment that substantially limits one or more of the major life activities. 42 U.S.C. § 12102(2)(B). A "record of such an impairment" means a "history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Flasza claims that the Arden report satisfies the definition.

The Arden report details Flasza's workers' compensation claims by listing the five claims and the terms of the settlement contracts. Settlement contracts award compensation based on percentage losses. Thus, the Arden report reveals that Flasza received money for 15 percent loss of the right leg, 5 percent loss of the left arm, 2 percent loss of the left arm, 5 percent loss of the right leg, and 20 percent loss of the left little finger. *See* Pl. 12(n), Ex. D. Flasza, however, concedes that he is not currently disabled. Moreover, Flasza presents no evidence that the losses reflected in the Arden report historically limited his major life activities in a substantial way. Because the impairment shown by the Arden report did not limit

Flasza's major life activities, the report cannot constitute a "record" of an impairment. Thus, Flasza is not disabled under the second definition.

 Flasza's central argument is that TNT perceived him to have a disability and discharged him based on that perception. In addition to protecting those with disabling impairments, the ADA also protects those "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). This definition is included to disabuse employers of myths about the disabled and to prohibit discrimination against those with an impairment that does not substantially limit major life activities. See H.R. No. 485(II) at 53, *reprinted in* 1990 U.S.C.C.A.N. at pp. 267, 335; *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Thus, a person is "regarded" as having an impairment if (1) he has a physical or mental impairment that does not substantially limit major life activities, but the condition is treated by an employer as constituting such a limitation; (2) he has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward the impairment; or (3) he does not have a qualifying impairment but is treated as having an impairment. 29 C.F.R. § 1630.2(*l*).

 Flasza develops a clever argument to establish that TNT perceived him as impaired. One of the reasons articulated by TNT for firing Flasza is that his answers during his physical examination conflicted with the Arden report. Vandevusse Dep. 54–55. In particular, TNT claims that Flasza dishonestly told the examining physician that he did not have a "permanent defect from illness, disease, or injury." *Id.* at 53–54, 61. TNT thinks Flasza was dishonest because the Arden report reveals percentage losses of various limbs. *Id.* at 59. Because TNT regards Flasza's answers as inconsistent or dishonest, Flasza claims TNT must

necessarily have deemed him to have a permanent injury or defect. The court draws this inference for the purposes of this motion.

But establishing that TNT perceived Flasza to have a defect or impairment does not end the inquiry. The term "disability" is a term of art under the ADA. There are two essential components to a "disability." First, a person must have a qualifying impairment. A qualifying impairment includes an anatomical loss affecting the musculoskeletal system. 29 C.F.R. § 1630.2(h)(1). Thus, TNT perceived Flasza to have a qualifying impairment. Second, the qualifying impairment must be such that it "substantially limits one or more of the major life activities of the individual." This is a second distinct prong of the definition, establishing that trivial impairments do not confer ADA protection. See H.R. No. 485(II) at 52, *reprinted in* 1990 U.S.C.C.A.N. at 334. A person is only disabled under the ADA if the impairment is substantially limiting.

 Flasza is disabled for ADA purposes only if TNT regarded him as having "such an impairment." TNT, therefore, must perceive that Flasza has a physical defect *and* that the defect substantially limits one or more of Flasza's major life activities. Flasza presents only indirect evidence that TNT perceived that he had a defect. Flasza presents no evidence whatsoever that TNT perceived that defect as substantially limiting a major life activity. As a result, Flasza does not raise a genuine issue of material fact as to whether he should be included within the protected class. The sparse case law on perceived disability supports this conclusion. In many cases, courts have granted summary judgment for an employer who eventually terminated an employee after first removing the employee from a particular job because of an impairment. In those cases, no showing was made that the employer perceived the employee as substantially limited for other jobs or in major life activities.[3] *See, e.g.,*

---

3. The definition of "handicapped person" under the Rehabilitation Act of 1973, 29 U.S.C. § 794 is identical to the definition of "individual with a disability" under the ADA. *Compare* 29 U.S.C. § 706(8)(B) *with* 42 U.S.C. § 12102(2). Congress used the phrase "disability" in the ADA to make use of currently accepted terminology. The terms "handicap" and "disability" are intended to be substantively identical. *See* H.R. No. 485(II), 101st Cong., 2d Sess. 50–51 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 332–33. Indeed, Congress amended the Rehabilitation Act

*Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993); *Forrisi v. Bowen,* 794 F.2d 931, 935 (4th Cir.1986); *see also Byrne v. Board of Educ.,* 979 F.2d 560, 567 (7th Cir. 1992). Flasza has not shown that TNT perceived him as substantially limited in *any* context.

## II. *Retaliatory Discharge*

 Count II asserts that TNT discharged Flasza in retaliation for Flasza's filing of five workers' compensation claims against his previous employer. Under Illinois law, a plaintiff claiming retaliatory discharge for filing workers' compensation claims must show (1) his status as an employee of the defendant before the injury; (2) his exercise of a right granted by the Illinois Workers' Compensation Act; and (3) that the discharge is causally related to the filing of the workers' compensation claim. *Groark v. Thorleif Larsen & Son, Inc.,* 231 Ill.App.3d 61, 172 Ill.Dec. 799, 802, 596 N.E.2d 78, 81 (1992). An employee may state a retaliatory discharge claim against a current employer who discharges the employee for filing workers' compensation claims against a former employer. *Darnell v. Impact Indus.,* 105 Ill.2d 158, 85 Ill.Dec. 336, 338, 473 N.E.2d 935, 937 (1984); *Groark,* 172 Ill.Dec. at 803, 596 N.E.2d at 82. Nevertheless, discharge of an employee who has filed a workers' compensation claim does not satisfy the requirement of a causal relationship if the basis for the discharge is valid and nonpretextual. *Groark,* 172 Ill.Dec. at 802, 596 N.E.2d at 81.

 TNT contends that Flasza was never an "employee" of TNT because he was only a casual worker guaranteed no more than eight hours of pay on any day. Flasza presents evidence that he worked six days a week for five uninterrupted weeks before he was terminated. Moreover, it appears that casual workers are termed "employees" under TNT's collective bargaining agreement. *See* Def.Mem., Ex. 1, art. 4 & 5. Finally, TNT does not explain how Flasza is different than any other at-will employee. An at-will

employee may sue his employer for retaliatory discharge. *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 563, 384 N.E.2d 353, 357 (1978). Although an employer may have an otherwise absolute power to terminate an employee, allowing the employer to use that power to terminate an employee for filing workers' compensation claims would force the employee to choose between his job and exercising his statutory rights. The Illinois legislature did not intend this result. *Kelsay,* 23 Ill.Dec. at 563, 384 N.E.2d at 357. To the extent that TNT claims Flasza cannot sue for retaliatory discharge because he is only an at-will employee, TNT's argument fails. If TNT is arguing that Flasza is not even an at-will employee, Flasza raises an issue of material fact to the contrary, and the dispute must be resolved by a factfinder.

TNT next argues that it had a valid reason to discharge Flasza: the comments of his prior employer made him less competitive, because of the inconsistency between the health report and the Arden report, and because his workers' compensation claims suggested that he might be at risk for excessive absenteeism and injury.

At the outset, it must be noted that TNT's response is qualified by the fact that "[b]ecause of the delay in notifying [TNT] of Plaintiff's claims, [TNT] personnel were unable to reconstruct with specificity the reasons why Plaintiff was deemed not qualified." Def. Br. at 8 n. 3. The employment file does not contain a reason for the discharge. Vandevusse, the person who made the decision, testified that she does not recall the reason why Flasza was discharged. *See, e.g.,* Vandevusse Dep. 52. TNT appears to have developed in hindsight its probable reasons for discharging Flasza.

Normally, this fact alone might entitle Flasza to some leeway in advancing a pretext argument. Flasza, however, raises a genuine issue of fact as to whether the reasons proffered are pretextual. The record suggests that Flasza was not only qualified for the position, Vandevusse Dep. 82, but that he

---

in 1992 to substitute the phrase "individual with a disability" for "handicapped person." As a result, cases interpreting the definition of "handicapped person" under the former language of

the Rehabilitation Act guide interpretations of the ADA, and several of those cases are used here.

may have been more desirable than most because he possessed a commercial driver's license that allowed him to be a "spotter." [4] Flasza Aff. ¶ 3. Indeed, Flasza was used as a spotter at the McCook terminal on an occasion when another spotter did not appear; Flasza was told that he did a good job and would be given spotter opportunities in the future. Flasza Aff. ¶ 11. Uncontroverted evidence also shows that Flasza performed his job well and was never criticized for his performance during his five-week stint with TNT. Flasza Aff. ¶ 10. Vandevusse testified that she does not recall whether she was provided with information of Flasza's performance when making her decision. Vandevusse Dep. 14–16. In addition, Flasza's recommendations from his previous employers were favorable. His most recent employer stated that "he never had a problem" with Flasza, that his dependability was "good, he was dependable," he was "on time," and that there was "no problem" with his attendance. When asked whether he would rehire Flasza, the former employer stated, "Yes. We would not have let him go. He left on his own." Pl. 12(n), Ex. D. Flasza's other former employer stated,

> [We had] no complaints. He was an excellent spotter. He did not make a lot of mistakes. He was not the fastest, but he worked at a steady pace as a dock worker.

*Id.* In addition, this employer stated that Flasza's dependability was "fine," that he was "always on time," and that he "always showed up." When asked if he would rehire Flasza, the former employer stated, "Sure I would." *Id.*

Vandevusse characterized these statements as less competitive because

> [Y]ou could read into [the statements]. If he did not make a lot, how many did he make? He was not the fastest, but he worked at a steady pace. We're looking at people that are hard workers that get the job done, that don't just work at a steady pace.

Vandevusse Dep. 122.

In addition, Flasza presents evidence that TNT hired other candidates with comparable recommendations from the same previous employer. Vandevusse Dep. 111–120. At least one of the candidates hired had poor credit, a factor TNT considered. Vandevusse Dep. 112. Moreover, despite TNT's claim that Flasza's work injury history made him a risk for absenteeism, Flasza points out that his most recent work injury was eight years before the termination decision and that his previous employers gave him excellent recommendations concerning his dependability and attendance. Pl. 12(n), Ex. D. Finally, Flasza notes that TNT received 47 Arden reports for potential employees between December 30, 1991 and December 31, 1992. TNT rejected 27 applicants. Six of the 27 rejected were reported by Arden to have filed workers' compensation claims against previous employers. In contrast, none of the twenty people hired by TNT had filed workers' compensation claims against previous employers. Flasza Aff. ¶ 17; Vandevusse Dep. 126–28.

Several facts therefore stand out when viewed in a light favorable to Flasza. The evidence shows that Flasza was qualified and performing well for five weeks while at TNT. TNT fired Flasza shortly after receiving the Arden report listing his workers' compensation claims and without considering his performance. Flasza's employment file states he did not meet TNT's "criteria," but TNT has no established criteria for judging applicants. Vandevusse Dep. 52. Instead, the process is "very subjective." Vandevusse Dep. 61. TNT hired applicants with Arden reports comparable or less positive than Flasza's, but who had not filed workers' compensation claims. TNT rejected every applicant who had filed a workers' compensation claim. TNT concedes that it considered Flasza's workers' compensation history, but only because of potential absenteeism. In TNT's words, "[t]he fact of the absence is the key issue not the reason for the absence." Pl. 12(n), Ex. C, p. 9–10. But Vandevusse never characterizes Flasza's periods of missed work because of his injuries (approximately 11.85 weeks in 18 years) as excessive. Moreover, Flasza's most recent claim was eight years before TNT's termination deci-

---

**4.** A spotter moves trucks and trailers between the loading dock and the yard. Flasza Aff. ¶ 3.

sion, and both of Flasza's previous employers stated that there were no problems with his attendance, one noting that he "always showed up." Pl. 12(n), Ex. D. Given these facts, a reasonable jury could conclude that TNT's proffered reasons for discharging Flasza are pretextual.

In the alternative, TNT claims that it is entitled to summary judgment because Flasza committed resume fraud. TNT notes that Flasza apparently suffered percentage losses, but checked boxes indicating that he suffered no "extensive confinement by illness or injury" and that he did not have a "permanent defect from illness, disease, or injury." TNT's argument is unpersuasive. First, Flasza argues that he does not recall answering questions about his health history, that the doctor filled out the forms, and that Flasza did not have an opportunity to review them. Flasza Aff. ¶ 4. Second, the issue in a discrimination case where an employee lies on an application and is later fired for an unrelated reason is whether the employer would have fired the employee upon discovery of the misrepresentation. *Washington v. Lake County*, 969 F.2d 250, 256 (7th Cir. 1992). Assuming Flasza is responsible for the answers on the forms, several issues of fact exist as to whether the answers are untrue. TNT digs up a thirty-day substance abuse program in which Flasza voluntarily participated eleven years ago as evidence that he was "extensively confined." Flasza argues that he was not "confined" at all during the program and that he was free to terminate his enrollment at any time. Flasza Aff. ¶ 7. In addition, TNT cites the percentage losses as evidence that Flasza lied about not suffering from a permanent defect. Flasza, however, asserts that he is not disabled and the language of "percentage losses" was used only for purposes of the settlement contracts. Flasza Aff. ¶ 8. Finally, no evidence is presented that TNT would have fired Flasza if it had discovered the alleged inconsistency. The closest evidence that TNT presents is that the inconsistencies it

perceived "could" have been a factor leading to the discharge, although TNT is not sure if they were considered. Vandevusse Dep. 53, 58, 59, 87; *see* Pl. 12(n), Ex. C, p. 10. TNT is not entitled to summary judgment on a resume fraud defense based on this evidence. Issues of material fact exist as to whether Flasza lied and whether TNT would have fired him because of the alleged misrepresentation.

### III. *Illinois Workers' Compensation Act Claim*

In Count III, Flasza alleges a claim against TNT under the Illinois Workers' Compensation Act, 820 ILCS 305/4(h). Section 305/4(h) states,

> It shall be unlawful for any employer ... to discharge or to threaten to discharge, or to refuse to rehire or recall to active service in a suitable capacity an employee because of the exercise of his or her rights or remedies granted to him or her by this Act.

Section 305/4(h) does not provide a civil remedy. Instead, Illinois courts interpret this section as stating Illinois' public policy against retaliation for filing workers' compensation claims; this provision animates the tort of retaliatory discharge that Flasza invokes in Count II of his complaint. *See Spearman v. Exxon Coal USA*, 16 F.3d 722, 725 (7th Cir.1994); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 564–65, 384 N.E.2d 353, 358–59 (1978). The retaliatory discharge tort does not arise under the workers' compensation laws; it is independent. *Spearman*, 16 F.3d at 725. Because the statute does not provide for a civil remedy, Flasza cannot sue for the alleged statutory violation. He may only allege a retaliatory discharge tort under Illinois common law.[5]

### CONCLUSION

TNT's motion for summary judgment is granted in part and denied in part. Judgment is entered for defendant TNT and

---

5. TNT's inclusion of a motion to dismiss in its summary judgment motion is disfavored. The motion to dismiss should have been raised prior to answering Flasza's complaint. But because Flasza cannot state a claim under the statute, the court dismisses Count III for want of jurisdiction. In any event, Flasza does not respond to TNT's argument for dismissal of the statutory claim.

against plaintiff John K. Flasza on Count I. TNT's motion for summary judgment on Count II is denied. TNT's motion to dismiss Count III for failure to state a claim is granted.