Hilton v. Wright

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: March 10, 2011                    Decided: March 9, 2012)

Docket Nos. 10-135-cv(L), 10-2245-cv (Con)

_____

ROBERT HILTON, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant*,

LOUIS VASQUEZ,

*Plaintiff*,

— v.—

LESTER N. WRIGHT, M.D., M.P.H., ASSOCIATE COMMISSIONER, CHIEF MEDICAL OFFICER FOR THE NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES AND NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES,

*Defendants-Appellees*.

_____

Before:

WINTER, POOLER, and HALL, *Circuit Judges*.

_____

Plaintiff-Appellant Robert Hilton appeals from the judgment of the United States District

Court for the Northern District of New York (Hurd, *J.*), dismissing his complaint against Dr.

Lester N. Wright and the New York Department of Correctional Services after granting the defendants' motion for summary judgment on Hilton's individual claims for damages arising from asserted violations of his rights under the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.  Hilton also appeals from that portion of a separate order of the district court denying his application, on behalf of a class, for the award of certain costs incurred by his counsel in connection with monitoring a settlement between the class and the defendants.  Because the district court did not adequately explain why it granted the defendants' motion for summary judgment on Hilton's claims for damages, we **vacate** the judgment and **remand** the case for the district court to address more fully the defendants' motion.  Additionally, because the district court misinterpreted the parties' settlement agreement with respect to the recovery of reasonable costs, we **vacate** that part of its order denying Hilton's application for reimbursement of out-of-pocket expenses and **remand** the issue to the district court for it to determine in its discretion whether to grant, fully or partially, Hilton's application for such costs.

VACATED AND REMANDED.

————————————

ELIZABETH L. KOOB, Koob & Magoolaghan, Yonkers, NY, *for Plaintiff-Appellant*.

OWEN DEMUTH, Assistant Solicitor General, *of counsel*, *for* Eric T. Schneiderman, Attorney General of the State of New York, Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, Albany, NY, *for Defendants-Appellees*.

————————————

*Per Curiam*:

Plaintiff-Appellant Robert Hilton appeals from the judgment of the United States District Court for the Northern District of New York (Hurd, *J.*), dismissing his complaint against Dr. Lester N. Wright and the New York Department of Correctional Services after granting the defendants' motion for summary judgment on Hilton's individual claims for damages arising from asserted violations of his rights under the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act. Hilton also appeals from that portion of a separate order of the district court denying his application, on behalf of a class, for the award of certain costs incurred by his counsel in connection with monitoring a settlement between the class and the defendants. Because the district court did not adequately explain why it granted the defendants' motion for summary judgment on Hilton's claims for damages, we **vacate** the judgment and **remand** the case for the district court to address more fully the defendants' motion. Additionally, because the district court misinterpreted the parties' settlement agreement with respect to the recovery of reasonable costs, we **vacate** that part of its order denying Hilton's application for reimbursement of out-of-pocket expenses and **remand** the issue to the district court for it to determine in its discretion whether to grant, fully or partially, Hilton's application for such costs.

**Background**

Plaintiff-Appellant Robert Hilton, a former state prisoner, is infected with the Hepatitis C virus ("HCV"), a slowly progressive but potentially fatal disease affecting the liver. Defendant-Appellee New York State Department of Correctional Services ("DOCS") was aware of Hilton's condition when he was placed in its custody in April 2003. Hilton served about a year in prison

3

but did not receive treatment for his condition allegedly because DOCS determined, pursuant to its guidelines then in effect, that Hilton's period of incarceration was not long enough to allow for proper evaluation and treatment. Shortly after Hilton was released, he was convicted of a new crime and returned to DOCS in August 2004.

In May 2005, after a lengthy screening process, certain members of the DOCS medical staff recommended that he be treated with antiviral drugs to combat his HCV. Hilton was not allowed to receive such treatment, however, without the express authorization of Defendant-Appellee Dr. Lester Wright, Chief Medical Officer and Assistant Commissioner of DOCS. Wright refused to allow treatment because he determined that Hilton was ineligible under existing DOCS guidelines—guidelines which he himself had promulgated. Specifically, because Hilton had admitted to using drugs in the past,[1] his HCV antiviral treatment was conditioned on his completion of or enrollment in one of two select DOCS substance abuse programs ("Program Requirement").[2] After Hilton was denied treatment, he sought to enroll in one of the programs, but he soon learned that he was ineligible because, as gauged by the earliest date of possible release, he was not going to be in prison long enough to complete that program. Around that time, Hilton complained to members of the prison medical staff about symptoms related to his HCV. The staff forwarded this information to Wright, noting that Hilton was again requesting antiviral treatment. Wright asked for Hilton's medical records and, after studying those related

---

[1] Hilton admitted in 1993 to having used marijuana and cocaine as a teenager. Periodic drug tests since 1993 have shown him to be drug free.

[2] These programs often had limited space available for new enrollees.

4

to prior HCV treatment at Bellevue Hospital in New York City, concluded that Hilton was a "non-responder" who would not benefit from antiviral treatment.

On August 17, 2005, a little more than three months after Hilton's original request for treatment was denied, Hilton filed this lawsuit against Wright and DOCS and moved for a temporary restraining order that would require Wright to authorize antiviral treatment. Shortly thereafter, Wright stipulated that he would authorize treatment for Hilton.[3]

On September 2, 2005, Hilton amended his complaint to join another inmate as a plaintiff and to assert claims on behalf of all similarly situated prisoners in the custody of DOCS. The complaint asserted three causes of action. First, under 42 U.S.C § 1983 and the Eighth and Fourteenth Amendments of the Constitution, it sought damages and equitable relief based on the defendants' asserted deliberate indifference to the plaintiffs' serious medical needs. The complaint alleged that the policy conditioning HCV antiviral treatment for former alcohol and drug users on their participation in the Program was without medical justification. The requirement's true aim, the complaint asserted, was to limit the number of inmates receiving such treatment and, thereby, save money. The complaint also asserted that DOCS had an unusually long HCV screening process in place for the same reason.[4] The second and third causes of action sought damages and equitable relief based on asserted violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29

---

[3] Hilton began receiving treatment immediately after Wright's stipulation and continued until September 2006, when his treatment was officially deemed a "failure." Subsequent to his release, Hilton again tried treatment, but without success.

[4] On appeal, Hilton does complain about the length of his screening process, but does not appear to argue that it amounted to cruel and unusual punishment under the Eighth Amendment.

5

U.S.C. § 705. They alleged that the defendants regarded the plaintiffs as disabled on the basis of their former drug or alcohol use, and discriminated against them through the Program Requirement.

The district court certified the class with respect to the plaintiffs' claims for injunctive relief in February 2006, and the parties began settlement discussions. In July 2007, they reached an interim settlement agreement, which became final in January 2008 ("Settlement Agreement"). The Settlement Agreement resolved all of the class's injunctive and equitable claims. It permanently eliminated the Program Requirement and provided steps to identify and treat those prisoners that had been previously denied medication because of their failure to participate in the Program.[5] The Settlement Agreement also called for payment to class counsel of fees for attorney and paralegal time used monitoring the Agreement's implementation for a two-year period. The award of those fees was capped at $20,000, subject to discretionary upward adjustment by the district court.

One method of such monitoring was the distribution of a questionnaire to affected prisoners. Hilton's lawyers agreed to collect and analyze the questionnaires and share the results with DOCS. This information was intended to give DOCS a definitive class list and a mechanism to monitor its own compliance with the Settlement Agreement. Because DOCS did not know which inmates had been denied treatment pursuant to the Program Requirement, the questionnaire was mailed to all HCV infected inmates and served as the class members' only form of notification about the Settlement Agreement. The expanded number of inmate responses

_____

[5] Although DOCS had voluntarily suspended the Program Requirement shortly after the initiation of this suit, the district court ruled that the prospect of reinstatement did not moot the case.

6

to the questionnaire greatly increased the administrative burden on Hilton's lawyers, who, according to Hilton, became essentially responsible for coordinating relief under the Settlement Agreement. They hired an assistant to enter data and manage correspondence with the inmates. This latter function also required retaining translation services and engineering several mass-mailings. Eventually Hilton's lawyers sent DOCS a list of around 700 potential class members, and DOCS, through its own records, was able to reduce the list to 302.[6]

The Settlement Agreement left Hilton and the other named plaintiff with claims against Wright and DOCS for damages only. The defendants moved for summary judgement on these claims. In a two-page order the district court granted the motion. As all of the plaintiffs' claims had either settled or been disposed of by summary judgment, the district court entered judgment dismissing Hilton's complaint. Hilton appealed and his co-plaintiff settled.

While Hilton's appeal was pending, his attorneys moved the district court for fees and costs incurred monitoring the Settlement Agreement. They applied for the maximum amount of attorneys' fees—$20,000—and also $17,000 in additional out-of-pocket expenses mostly incurred paying the hired assistant to administer the questionnaires and compile the original class list. The district court granted the full amount of documented attorneys' fees—$23,152—but denied the out-of-pocket expenses.

**Discussion**

Section 1983 Claims Against Dr. Wright

---

[6] Ultimately DOCS determined that fifty-eight inmates were true class members—*i.e.*, prisoners who, like Hilton, had HCV treatment denied or delayed because of the Program Requirement.

7

Hilton appeals the district court's decision to grant summary judgment against him on his Section 1983 claim for damages against Dr. Wright. The district court disposed of that claim in one paragraph. It concluded that there was not a genuine issue of material fact about whether Dr. Wright's conduct violated the Eighth Amendment because:

> Plaintiffs Robert Hilton and Louis Vasquez [not a party to this appeal] had three and four months [sic] delay respectively for treatment of their Hepatitis C because of the requirement to enroll in an ASAT or RSAT program. The plaintiffs' submitted records fail to establish that either received a serious injury because of the delays.

Additionally, the district court held that even if there were a genuine issue of material fact about whether Hilton's constitutional rights were violated, Dr. Wright nevertheless would be entitled to qualified immunity.

Although we review grants of summary judgment *de novo*, the opinion of the district court is often helpful in guiding our examination of the record. In this case, the extreme brevity of the district court's opinion with respect to Hilton's Section 1983 claim denies us this usual assistance. Indeed, the district court's determination that Dr. Wright enjoys qualified immunity from Hilton's claim is entirely conclusory and essentially requires this court to consider the issue in the first instance. Under these circumstances, we elect to vacate the district court's grant of summary judgement against Hilton on his Eighth Amendment claim and remand the issue for further explanation as to one or both of the following questions:

> (1) *why*, given the evidence on the record, there is no genuine issue of material fact about whether Dr. Wright is entitled to qualified and immunity, and (2) *why* there is no genuine issue of material fact about whether the doctor's conduct violated the Eighth Amendment.

When clarifying these aspects of its decision, the district court should bear in mind the following. In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court revised the

8

traditional two-step qualified immunity analysis set out in *Saucier v. Katz*, 533 U.S. 194 (2001). *Saucier* had instructed courts considering a defendant's qualified immunity from suit to first determine whether the plaintiff had a viable claim that one or more of his or her constitutional rights had been violated. *See id.* at 201. If the court was satisfied that the plaintiff had indeed alleged—or, in the context of a motion for summary judgement, shown a genuine issue of material fact regarding—a constitutional violation, then the next step under *Saucier* was to determine whether the conduct alleged violated a clearly established constitutional right about which an objectively reasonable person would have known. *See id.*; *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This was to ensure that government officials are not held liable for conduct that, prior to the case at hand, was generally thought to be acceptable. *Pearson* freed courts from the mandatory nature of *Saucier*'s two-step process and allowed them to do the second, and often dispositive, step first. 555 U.S. at 236-37. Henceforth courts may avoid reaching difficult questions of constitutional law where there is no question that an objectively reasonable government official would not have known his conduct was in violation of the Constitution, that is, where the right asserted by the plaintiff is not clearly established.

As it stands now, "judges of the district court . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Thus, we do not pass on which step of the qualified immunity analysis the district court should first undertake. It may begin its analysis by considering whether conditioning medical treatment for a progressive disease on participation in a prison program violates a clearly established right that

9

an objectively reasonable person would have known about, or it may first address whether such a practice *in fact* violates the Eighth Amendment.

If the district court decides, or is eventually compelled, to consider the underlying constitutionality of Dr. Wright's conduct, we note there may well be genuine issues of material fact. The Supreme Court has interpreted the Eighth Amendment as guaranteeing a prisoner medical treatment for serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference by the government to such medical needs thus violates the Constitution. *See id.* at 104-05. No party disputes that Hilton's medical needs were serious, but the two sides disagree about whether Dr. Wright's response to these needs (or lack thereof) rose to the level of deliberate indifference. To establish deliberate indifference, Hilton must show that Dr. Wright harbored the requisite mental state while he denied Hilton treatment. He must show that Dr. Wright knew of and disregarded an excessive risk to Hilton's safety; that he not only was aware of facts from which a reasonable person would conclude Hilton faced an excessive risk, but that he personally *actually* drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994). This mental state is akin to subjective recklessness; it need not be shown that Dr. Wright intended for Hilton to suffer harm, but Dr. Wright's actions in this regard must have been more than merely negligent. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Relevant to this inquiry are questions of fact such as: what did Dr. Wright know about how long Hilton's treatment had been delayed and what did Dr. Wright know about the likely medical consequences of such a delay?

Hilton points to evidence in the record that might contradict the district court's implicit holding that there were no genuine issues of material fact about (1) how long Hilton was denied

10

treatment (three months) or (2) how seriously Hilton was injured as a result of such delay (not seriously). These facts, while not necessarily material in and of themselves, may be material in the district court's overall analysis because they bear on what Dr. Wright knew about the health risks facing Hilton.

First, it is not clear from the record that there is no genuine issue of fact about how long Hilton was denied treatment by DOCS. Hilton points to evidence that DOCS was aware that he had HCV when he was incarcerated in 2003 and 2004. Although DOCS did not rely on the Program Requirement as a justification for denying Hilton treatment during this first period of incarceration, the fact—if proved—that Hilton was denied treatment at that time may be relevant to the question of what Dr. Wright knew about Hilton's conditions and medical history when he denied Hilton treatment in the summer of 2005.

Second, and relatedly, Hilton argues that there is evidence in the record indicating that a three-month delay in treatment for HCV could be seriously harmful for a person like him whose infection was advanced and, for the most part, previously untreated. Again, if Hilton could establish that the delay in treatment caused him harm, this fact might bear on Dr. Wright's knowledge of the risks to which he was subjecting Hilton.

Finally, we note with respect to Hilton's experience during his first period of incarceration, it appears from Hilton's brief that he is now alleging that his Eighth Amendment rights were violated not only by the Program Requirement, but also by DOCS's policy of denying HCV treatment to certain prisoners whose expected prison terms are less than fifteen months. Hilton did not raise this issue in his complaint for he only learned for the first time through the defendants' Statement of Material Facts that the fifteen-month minimum was

11

DOCS's basis for denying treatment in 2003 and 2004. At that point, Hilton argued the claim to the district court as part of his opposition to the defendants' motion for summary judgment. When the district court is briefed on an issue that can be understood as implicit in the larger challenge, the opposing party does not argue waiver, and the district court considers the issue, then that issue is not waived. *See Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010). We have no indication from the district court's decision whether it regarded the issue as waived, and we decline to make such a determination on appeal. On remand, the district court is instructed to consider whether Hilton's Eighth Amendment argument based on DOCS's initial denial of treatment in 2003 and 2004 has been waived, and if it has not been waived, then to decide it.

ADA and Rehabilitation Act Claims Against DOCS and Dr. Wright

Hilton also challenges the district court's dismissal of his claims against DOCS and Dr. Wright in his official capacity under the ADA and Rehabilitation Act.[7] Defendants argue that the dismissal should be affirmed because Hilton has failed to produce any evidence that Dr. Wright or DOCS regarded him personally as being substantially limited in a major life activity. Until January 1, 2009, when amendments to 42 U.S.C § 12102 went into effect, *see* ADA Amendments Act of 2008, Pub. L. 110-325,§§ 4(a), 8, 122 Stat. 3555, (2008), the defendants would have been correct, as Hilton would not have been able to demonstrate that he was "disabled" within the meaning of the ADA. Prior to that point, a plaintiff, such as Hilton, seeking to avail himself of the "regarded as" prong of the definition of "disability" needed to

---

[7] When brought together, claims under these two statutes may be treated identically. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

12

show that he was perceived as both "impaired" and "substantially limited in one or more major life activity." *See Flasza v. TNT Holland Motor Express, Inc.*, 159 F.R.D. 672, 678 (N.D. Ill. 1994) ("TNT . . . must perceive that Flasza has a physical defect *and* that the defect substantially limits one or more of Flasza's major life activities."); *accord Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002); *Katz v. City Metal Co.*, 87 F.3d 26, 32 (1st Cir. 1996). Because we determine disability on an "individualized, case-by-case basis," *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 151 (2d Cir. 1998), under the old regime, Hilton could survive summary judgment on his ADA claim only if he could raise a genuine issue of material fact about whether Dr. Wright and/or DOCS regarded him personally as being substantially limited in a major life activity. The record is devoid of any such evidence.

In 2008, however, Congress passed the ADA Amendments Act, which substantially re-worked the language of Section 12102. Among other things, what was formerly subsection (2)(C) became subsection (1)(C) and was amended to include the following parenthetical: "as described in in paragraph (3)." *Compare* 42 U.S.C. § 12102 (2006) *with* ADA Amendments Act § 4(a). Paragraph (3), in turn, was completely new and reads in relevant part:

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):
     (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not* the impairment limits *or is perceived* to limit a major life activity.

*Id.* (emphasis added). Lest there be any confusion about the amendment's effect on subsection (1)(C), the Committee Report states:

13

> The Committee therefore restores Congress's original intent by making clear that an individual meets the requirement of "being regarded as having such an impairment" if the individual shows that an action (e.g. disqualification from a job, program, or service) was taken because of an actual or perceived impairment, *whether or not* that impairment actually limits *or is believed* to limit a major life activity.

H.R. Rep. No. 110-730, pt. 1, at 14 (2008) (emphasis added).

Although both parties thought that Hilton needed to demonstrate that the defendants regarded him as being substantially limited in a major life activity, it is clear that he was only required to raise a genuine issue of material fact about whether Dr. Wright and/or DOCS regarded him as having a mental or physical impairment. Hilton was not required to present evidence of how or to what degree they believed the impairment affected him.

Regulations promulgated by the Department of Justice ("DOJ") continue to include "drug addiction" among the conditions qualifying as a "physical or mental impairment," 28 C.F.R. § 35.104(1)(ii) (2011), and there is no dispute that the defendants regarded Hilton as a former drug user. There thus seems to be a genuine issue of material fact as to whether the defendants regarded Hilton as having a "drug addition," which, to the extent that the DOJ's definition is persuasive,[8] would constitute a physical or mental impairment for the purposes of Section 12102.

---

[8] We note that the Department of Justice regulations have not tracked the ADA Amendments Act of 2008, and continue to define disability as Section 12102 did before the Amendments. *See* 28 C.F.R. § 35.104. That is, there is nothing in the regulations analogous to Section 12102(3) indicating that a substantial limitation on major life activities need not be perceived or believed for a "disability" to be established under the "regarded as" prong. The regulation does, however, define "is regarded as" as reaching situations where the victim "has none of the impairments defined in paragraph (1) [including drug addiction] but is treated by a public entity as having such an impairment." 28 C.F.R. § 35.104(4)(iii). On remand, the district court should resolve, with the benefit of further briefing, what effect, if any, this regulation should have on its interpretation of Section 12102(1)(C).

14

Obviously, none of this would matter if Hilton's suit for damages is precluded by the Eleventh Amendment as the district court appears to have held. The district court, however, was not express in its reasoning and did not even refer directly to the Constitution. Given that Hilton may have presented an otherwise triable issue of fact regarding his ADA claim, we are not inclined to affirm summary judgment upon so thin a reed. Instead, we remand Hilton's ADA claim for clarification and for expansion of the district court's Eleventh Amendment analysis. If the district court determines that Dr. Wright and DOCS are not protected by the Eleventh Amendment, the court may move on to consider whether drug addition constitutes a "physical or mental impairment," *see supra* note 8, and, if so, whether there are genuine issues of material fact with respect to the other elements of a Title II ADA claim, *cf.* 42 U.S.C. § 12132.

Award of Attorney's Costs Under the Settlement Agreement

Finally, Hilton argues that pursuant to 42 U.S.C. § 1988, and a number of cases interpreting that statute, he is entitled to recover the reasonable expenses of the litigation. The defendants argue that the provisions of the Settlement Agreement displaced Section 1988 to the extent that it would otherwise apply.[9] We agree, as a plain reading of the Settlement Agreement favors this interpretation. After providing for Hilton's lawyers' ("Class Counsel") full reimbursement for fees and costs up until the Agreement was signed, it states in relevant part:

---

[9] Defendants also assert that Hilton's out-of-pocket expenses are unreasonable and pertain to work outside the scope of the Settlement Agreement. This argument is without merit. The Settlement Agreement expressly called for Hilton's lawyers to collect the questionnaires from potential class members, tabulate the information collected, and share a summary of the information with DOCS so that DOCS could ascertain a definitive class member list. Nearly all of Hilton's lawyers' out-of-pocket expenses were incurred complying with this provision of the Settlement Agreement.

15

> Class Counsel will further be paid at a rate of $160 an hour for attorney time and $80 an hour for paralegal time for hours incurred during the two year monitoring period described herein. Fees for the herein described monitoring period will capped [sic] at $20,000. Class Counsel reserves the right to seek Court intervention to enlarge this limit upon a showing that such enlargement is reasonable to enforce the terms of this Agreement.

Although Hilton argues that the parties contracted only as to "fees" and not "costs," the language of the Agreement shows an intent to cap all reimbursement at $20,000 subject to the district court's discretion to enlarge the limit. The Section 1988 jurisprudence relied upon by Hilton in his claim for out-of-pocket costs actually buttresses this interpretation of the Settlement Agreement. Under that statute, the term "Attorney's Fees" includes reasonable litigation expenses. *See, e.g.*, *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989); *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987). Moreover, there is no question that the Settlement Agreement covered paralegal fees. Hilton concedes that a substantial portion of the out-of-pocket costs was for paralegal work that, if billed at the Settlement Agreement's rate, would far exceed the $20,000 cap. Hilton's repackaging of the paralegal work as "out-of-pocket" at cost, rather than at the higher agreed upon paralegal rate, is insufficient to circumvent the terms of the Agreement.

Insofar as the district court seems to have interpreted the Agreement to affirmatively preclude recovery of such costs, we find no support for this position in the language of the Agreement. Thus, to the extent that out-of-pocket costs combined with attorney's fees exceeded the Agreement's $20,000 limit, the district court has discretion to raise the limit. As it does not appear that the court exercised this discretion, we remand for further consideration of the issue of Hilton's out-of-pocket expenses and instruct the district court to consider whether such costs should be awarded pursuant to paragraph six of the Settlement Agreement.

**Conclusion**

16

Accordingly, the judgment of the district court dismissing Hilton's complaint and that portion of the district's court's order denying Hilton costs under the Settlement Agreement are VACATED and REMANDED for further consideration in light of this opinion.