**Robert HILTON and Louis Vasquez, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Lester N. WRIGHT, M.D., M.P.H., Associate Commissioner/Chief Medical Officer, for the New York State Department of Correctional Services; and New York State Department of Correctional Services,[1] Defendants.**

No. 9:05–CV–1038.

United States District Court,
N.D. New York.

March 11, 2013.

---

1. The New York State Department of Correctional Services has since been renamed the New York State Department of Correctional Services and Community Supervision, and will be referred to as such.

Koob & Magoolaghan, of Counsel: Elizabeth L. Koob, Esq., Joan Magoolaghan, Esq., Yonkers, NY, for Plaintiffs.

Eric T. Schneiderman, Attorney General for the State of New York, of Counsel: Belinda A. Wagner, Esq., James Seaman, Esq., Ass't. Attorneys General, Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .537

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .538

Factual History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .538
 The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .538
 The Hepatitis C Virus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .538
 DOCCS' Hepatitis C Primary Care Practice Guidelines . . . . . . . . . . . . . . . . . . . . . .539
 Plaintiff's Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .541
Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .543

GENERAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .544
 Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .544
 Capacity of Claims against Dr. Wright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .545
 Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .545

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .545
 Section 1983 Claim: Dr. Wright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .546
 Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .546
 Merits of Eighth Amendment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .546
 Serious Medical Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .547
 Deliberate Indifference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .548
 July 2003 Denial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .549
 May 2005 Denial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .551
 Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .552
 Americans with Disabilities Act Claim: Dr. Wright and DOCCS . . . . . . . . . . . . . . . .553
 Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .553
 Merits of Title II Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .553
 Sovereign Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .555
 Rehabilitation Act Claim: Dr. Wright and DOCCS . . . . . . . . . . . . . . . . . . . . . . . . . . .556
 Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .556
 Merits of Section 504 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .556
 Award of Fees and Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .557

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .559

## I. *INTRODUCTION*

Plaintiff Robert Hilton ("Hilton" or "plaintiff") [2] brought suit against defendant Lester N. Wright, M.D., M.P.H. ("Dr. Wright") and the New York State Department of Correctional Services and Community Supervision ("DOCCS") (collectively "defendants") pursuant to the Civil Rights Act, 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 ("Title II") [3]; and Sec-

tion 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), alleging that Dr. Wright was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution, and that both Dr. Wright and DOCCS discriminated against him in violation of Title II and Section 504 by failing to treat his chronic Hepatitis C ("HCV"). Currently under consideration is defendants' motion for summary judgment.

**2.** Louis Vasquez ("Vasquez") was also a named plaintiff but has since settled with defendants and is not a party to this appeal nor this decision.

**3.** The ADA is comprised of the following five Titles: Title I—Employment; Title II—Public entities (and public transportation); Title III—Public accommodations (and commercial facilities); Title IV—Telecommunications; and Title V—Miscellaneous provisions. Title II is at issue here.

## II. *BACKGROUND*

### A. *Factual History*

#### 1. *The Parties*

Plaintiff is a 58 year old African–American male with HCV, genotype 1. He was first diagnosed with HCV in 1999 at Bellevue Hospital in New York City ("Bellevue"), where a liver biopsy revealed scarring and fibrosis and rated his liver disease as Stage 2 fibrosis, and Grade 2 inflammation.[4] According to plaintiff, he received HCV treatment at Bellevue in 1999 for almost one year. The record is unclear whether he completed the full course of treatment.[5]

Plaintiff entered DOCCS' custody on April 14, 2003, and was released on April 29, 2004. He was incarcerated again from August 18, 2004, to May 1, 2007.[6] He alleges defendants denied him HCV treatment since 2003 on the basis that he failed to complete an alcohol and substance abuse treatment ("ASAT") program. Plaintiff argues there is no medical basis for conditioning HCV treatment on enrollment in an ASAT program.

Dr. Wright is the Deputy Commissioner and Chief Medical Officer of DOCCS. As Chief Medical Officer, he is responsible for the development and implementation of medical policies and practices for inmates in DOCCS' custody. Dr. Wright must approve every request by a treating physician to have an inmate receive any medical treatment for HCV. Individual facility physicians do not have the authority to prescribe HCV treatment without Dr. Wright's approval.

#### 2. *The Hepatitis C Virus*

HCV is a blood-borne virus which affects the liver. It attacks, and if not treated, commonly destroys the liver. Liver damage progresses through a series of stages beginning with fibrosis, or scarring, and often ending in cirrhosis, or pervasive scarring and inflammation. Cirrhosis often leads to liver cancer.

As of 2002, the standard clinical treatment for HCV patients with genotype 1 was a forty-eight week course of medication combining two antiviral agents, Pegylated Interferon and Ribavirin ("combination therapy"). Like many diseases, the treatment for HCV has side effects. It can cause further damage to the liver, harm the kidneys, and affect platelets and red and white blood cells.[7] Other side effects of combination therapy include headaches, soreness of muscles, sore joints, fatigue, hair loss, skin rash, depression, and suicidal feelings.

When successful, combination therapy can effectively cure HCV. If a patient's viral levels remain undetectable six months after the completion of HCV therapy, they are considered to have achieved a "sustained viral response" and are considered cured. A patient who at first responds

---

4. Fibrosis is scored from stage 0 (no fibrosis) to stage 4 (cirrhosis). Inflammation is scored from grade 0 (no inflammation) to grade 4 (extensive inflammation).

5. According to plaintiff's 2005 affidavit, he claimed he was unable to complete treatment because he became homeless. However, according to his 2008 deposition, he completed treatment and saw his doctor regularly, but his treatment was unsuccessful and was told to wait a year before trying again because of the side effects.

6. His other periods of incarceration are not relevant to this lawsuit.

7. A low platelet count increases the chances for serious bleeding in the event of an injury. A low red blood cell count can increase the likelihood of a heart attack or stroke due to insufficient delivery of oxygen to the heart or brain. A low white blood cell count can compromise the patient's ability to fight infections.

positively with HCV treatment, but upon completion of the treatment, the viral load returns to its previous levels is considered to be a "relapser." Finally, a patient who never responds during treatment is considered to be "non-responder."

### 3. *DOCCS' Hepatitis C Primary Care Practice Guidelines*

DOCCS develops and regularly updates clinical practice guidelines for various diseases in an effort to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment. DOCCS houses a large number of inmates who are infected with HCV and accordingly developed guidelines relating to the primary care of inmates with HCV. The Hepatitis C Primary Care Practice Guideline was initially developed and approved on March 31, 1999, and was based upon information from many sources including national guidelines, consensus statements, and recommendations, along with peer-reviewed medical journals (the "Guidelines"). Specifically, Dr. Wright cites three governmental studies in support of the Guidelines: (1) the Centers for Disease Control and Prevention's ("CDC") "Recommendations for Prevention and Control of Hepatitis C Virus (HCV) Infection and HCV–Related Chronic Disease"; (2) the 1997 National Institutes of Health ("NIH") consensus statement on management of HCV; and (3) the CDC Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings, 52 MMWR 1, 25 (2003). Wright Decl., Apr. 16, 2009, ¶¶ 9–10. According to defendants, the Guidelines have been modified consistent with the evolution of care and treatment for HCV. Dr. Wright, as Chief Medical Officer, was responsible for the approval and implementation of the guidelines. Integral to this case are the Guidelines that were in effect at the time of plaintiff's two relevant periods of incarceration: April 14, 2003 to April 29, 2004, and August 18, 2004, to May 1, 2007.[8]

Before an inmate can receive combination therapy, the treating facility physician must submit a request to Dr. Wright's office. The Guidelines set forth preconditions for approval of treatment. Two of those preconditions are at issue here. The first requirement relates to an inmate's anticipated term of incarceration. It provided:

> Anticipated incarceration adequate to complete evaluation and treatment; 9 months of genotype 2 and 3, 15 months for genotype 1 or 4, from the time of referral (this includes the 12 month treatment course.). Inmates who will not predictably complete a course of treatment should receive a baseline evaluation and be referred for medical follow-up and treatment upon release.

Wright Decl., Ex. A at 6, ¶ 13 ("Length of incarceration Requirement"). Defendants assert this criterion was developed based upon medical judgment that interrupted treatment was apt to be not only ineffective, but also dangerous, and was based on a NIH recommendation.

The second precondition for HCV treatment required that any former drug or alcohol user complete a substance abuse program. That requirement stated: "No evidence of active substance abuse (drug and/or alcohol) during the past 6 months (check urine toxicology screen if drug use is suspected). Those who have a substance use history must successfully complete or be enrolled in an ASAT/RSAT

---

**8.** During these periods, the Guidelines were revised on March 25, 2003, and again on July 20, 2004.

program." *Id.* at 6, ¶ 11. That precondition was revised on July 20, 2004, to state:

No evidence of active substance abuse (drug and/or alcohol) during the past 6 months. In order to be sure that this is applied uniformly throughout the system, if you have an inmate/patient who might otherwise qualify for Hepatitis C treatment except for a drug or alcohol-related incident in the past six months, please submit the Approval for Treatment" [sic] form as you would for anyone without such incident. The incident will be evaluated individually to determine what it consisted of and whether or not it results in temporary disqualification for treatment. Those who have a substance use history must successfully complete or be enrolled in an ASAT/RSAT [Alcohol Substance Abuse Treatment/Residential Substance Abuse Treatment] program.

*Id.* at 23–24, ¶ 11 ("ASAT Requirement").

According to defendants, nearly all of DOCCS inmates with HCV contracted it through substance abuse. Because continued use of alcohol or other liver toxic substances greatly accelerates liver damage and may cause new infection in even those for whom HCV treatment was successful, defendants maintain that substance abuse treatment and abstinence from substance abuse are critical to the success of combination therapy as well as for the long-term success of HCV treatment. As a result, defendants contend it was medically prudent and reasonable to require that inmates who have had prior drug or alcohol involvement pursue a multi-dimensional and multi-disciplinary course of substance abuse treatment to ensure success in the HCV treatment regimen. Defendants assert the ASAT Requirement was supported by medical literature available at the time. As explained below, the ASAT Requirement, although encouraged for the benefit of the inmate, is no longer a prerequisite to receiving HCV treatment.

According to plaintiff, the ASAT Requirement did not comply with NIH standards. Instead, NIH standards recommended treatment for any patient with elevated alanine aminotransferase ("ALT"),[9] portal or bridging fibrosis, or at least moderate degrees of inflammation. With respect to substance abuse, plaintiff asserts the NIH recommended that the treatment of patients who are drinking significant amounts of alcohol or who are actively using illicit drugs should be delayed until such habits are discontinued for at least six months. The reasoning behind delaying treatment is the risk of a toxic effect from the alcohol and drugs when taken with the combination therapy, and potential problems of non-compliance. Plaintiff also contends that by 2003, the NIH recommended treatment be commenced for all people testing positive for HCV, even those actively abusing alcohol or drugs, but not patients whose illness had advanced to compensated cirrhosis.

9. ALT and aspartate aminotransferase ("AST") are two liver enzymes. They are both proteins made by liver cells; ALT is only made by liver cells while AST is found in parts of the body other than the liver, including the heart, kidneys, muscles, and brain. When liver cells are damaged, ALT and AST leak out into the bloodstream and the levels of ALT and AST in the blood become higher than normal. A high ALT level often means there is some liver damage. A high AST level could indicate damage in many different parts of the body. ALT and AST levels do not tell you how much liver damage there is, or whether the liver is getting better or worse, and small changes are expected. Decrease in levels however are helpful to analyze the success of HCV treatment. *See Understanding Lab Tests*, United States Department of Veterans Affairs (Mar. 1, 2013), http://www.hepatitis.va.gov/patient/diagnosis/labtests-AST.asp.

### 4. *Plaintiff's Medical History*

Hilton was transferred to DOCCS' custody April 14, 2003 from the New York City Department of Corrections ("NYCDOC"). On intake at Washington Correctional Facility, his health record noted his diagnosis of HCV and included the results of blood tests showing elevated ALT levels. Laboratory tests the following day confirmed his HCV infection and showed an elevated ALT. He was scheduled to meet with a doctor on May 19, 2003 to discuss his HCV status and other medical conditions (including hypertension, high cholesterol, depression, and diabetes). That appointment took place on May 30, 2003. At that time, Hilton indicated that he had been previously treated for HCV outside the correctional setting, and DOCCS scheduled follow-up labs.

On July 21, 2003, it was noted that an estimate of Hilton's possible release date was needed. On July 23, 2003, a chart review was completed and it was noted that plaintiff's conditional release date was October 2004 but that he may get released early, and it was recommended he follow-up with HCV treatment outside of DOCCS. According to the Length of incarceration Requirement in the Guidelines, the anticipated incarceration for genotype 1 needed to be at least fifteen months for time to evaluate and treat HCV. Because Hilton did not have fifteen months remaining before his conditional release date of October 2004, he was denied HCV treatment (the "July 2003 denial"). A later blood test confirmed Hilton had genotype 1 of the virus. This was noted on his medical chart on August 27, 2003. He was released from DOCCS' custody on April 29, 2004.

Plaintiff reentered DOCCS' custody at Downstate Correctional Facility on August 18, 2004 for his final term of incarceration. Again, prior to this term, Hilton was confined under the custody of NYCDOC.[10] Upon intake at Downstate, plaintiff's medical history was again reviewed, which contained NYCDOC records as well as DOCCS records from Hilton's earlier incarceration. These records showed Hilton's HCV genotype and persistent elevated ALT and AST levels. Despite these records, DOCCS initiated a new screening process for HCV treatment. According to defendants, Hilton reported during intake that he had abused alcohol.

Plaintiff was thereafter transferred to Altona Correctional Facility where additional HCV testing was conducted. Blood tests in October 2004 indicated a high viral load compared to his reference range, but his liver function tests and ALT and AST levels were within normal limits. Further tests were conducted on November 3, 2004 (reconfirming his HCV genotype of 1); January 5 and 26, 2005 (reconfirming abnormal liver test results, including high ALT and AST levels), and March 30, 2005 (borderline ALT level and high viral load). Pursuant to the Guidelines, one of the criteria for HCV treatment was elevated ALT. Plaintiff disputes that elevated ALT is even a requirement for HCV treatment in the medical community.

Defendants assert an additional concern in treating plaintiff's HCV was determining the extent to which he received prior HCV treatment and what kind of treatment it was. Plaintiff's medical records were requested from Bellevue on December 30, 2004, although plaintiff disputes that this was done. As of March 2, 2005, the records still had not been received from Bellevue.[11] April 5, 2005 test results

---

10. In May 2004 while in the custody of NYC-DOC, Hilton tested positive for HCV and blood tests showed elevated ALT and AST levels.

11. Defendants contend this was due to confusion over the proper authorization form needed.

showed a high viral load and slightly elevated AST and ALT. On April 22, 2005, plaintiff had a consultation with a gastroenterologist who recommended that DOCCS begin treating Hilton with combination therapy. The doctor noted the 1999 liver biopsy which showed fibrosis and inflammation. In his opinion, Hilton was an appropriate candidate for treatment.

On May 4, 2005, a mental health referral was made so that Hilton could get cleared to begin HCV treatment. The same day, the facility physician completed the Approval for Treatment form request, which indicated that ASAT was requested on March 2005 (due to plaintiff's admitted alcohol use), but had not yet begun. The facility physician also noted that plaintiff had been treated for HCV in 2002 but that the medical records relating to that treatment were spotty. Dr. Wright responded the same day approving combination therapy upon Hilton's enrollment in ASAT, and directed the physician to expedite his ASAT enrollment. On May 10, 2005 plaintiff was notified that his placement on an ASAT waiting list was not good enough and his HCV treatment was thus denied.

Plaintiff was thereafter transferred to Washington Correctional Facility on or about May 16, 2005. His medical chart was reviewed by Washington staff on June 8, 2005. Staff learned that plaintiff's HCV treatment had been denied because he was not enrolled in ASAT. Until he was enrolled, he could not be treated. There was further confusion at Washington about plaintiff's prior HCV treatment at Bellevue. Plaintiff's next lab results from June 22, 2005 showed elevated AST and ALT levels.

On July 14, 2005 Hilton complained of pain at night in the liver area, and again of severe pain in the liver area three to four times a week with nausea, vomiting, and weakness a few days later. On July 24, 2005 the facility physician submitted an Approval for Treatment form to Dr. Wright regarding plaintiff's HCV treatment. The physician indicated that plaintiff had six months of combination therapy in 2000 at home. The form also indicated that the ASAT Requirement was waived by guidance staff and that plaintiff did not have a substance abuse problem. The following day, Dr. Wright inquired about the degree of fibrosis on plaintiff's 1999 biopsy, his viral response to prior treatment, and whether DOCCS had his prior medical records. The next day the facility nurse administrator responded that the Bellevue records were incomplete and difficult to decipher. The Bellevue records included a reference to HCV treatment started on January 3, 2000, and an August 2000 note indicated Hilton finished six months of combination therapy. However, Bellevue records from 2002 indicated his treatment continued until February 2002.

Dr. Wright replied the following day, on July 26, 2005 stating:

> [T]here is no evidence that his prior treatment was successful (viral load undetectable) but only evidence that is [sic] was not ... Published studies show that retreatment absent complete response is not useful and it is not recommended ... Based on his history of lack of response to prior treatment, there is no medical indication for treatment at this time.

Defs.' Statement of Material Facts, ¶ 58, Dkt. No. 97–25. Dr. Wright further noted that Hilton had a substance abuse history. Also on that day, Hilton was informed that although he was initially placed on an ASAT waiting list, his request would now be denied because he did not have enough time to complete the ASAT program before his earliest release date.

On August 17, 2005, plaintiff initiated this lawsuit and moved for a temporary restraining order and preliminary injunc-

tion compelling defendants to authorize his HCV treatment. Dr. Wright contends that in light of the motion, he reviewed plaintiff's complete medical chart and could not determine that plaintiff had twenty-four weeks of treatment in the past and that the result after twenty-four weeks of completed treatment was treatment failure, thus Hilton could not be classified as a non-responder nor a relapser. Instead, Dr. Wright classified plaintiff as having incomplete treatment in the past, and approved him to receive combination therapy. Plaintiff began receiving treatment on August 25, 2005. Although Hilton first achieved positive results with treatment, by September 2006 he was informed that the treatment had failed. In January 2007 plaintiff was classified as a relapser.

After his release from DOCCS in May 2007, Hilton received HCV treatment from a private physician but discontinued treatment after a short time because of the side effects.

## B. *Procedural History*

As previously noted, Hilton commenced this action on August 17, 2005 on behalf of himself and a class of others similarly situated. *See* Compl. On September 2, 2005 he amended the complaint to add Vasquez as a named plaintiff. *See* Am. Compl. At that time, both plaintiffs had HCV and were inmates under defendants' care and custody. Plaintiffs alleged defendants refused to administer necessary HCV treatment based on DOCCS' Guidelines. They asserted that defendants' refusal resulted in a deprivation of their right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Plaintiffs sought in-

junctive and declaratory relief, as well as compensatory and punitive damages. On October 18, 2005, defendants announced the recision of the ASAT Requirement as a prerequisite for combination therapy.

By Memorandum–Decision and Order filed February 27, 2006, the plaintiff class was certified. *Hilton v. Wright*, 235 F.R.D. 40 (N.D.N.Y.2006). The parties thereafter engaged in settlement negotiations relating to the class claims. On July 19, 2007, the parties entered into an Interim Settlement Agreement, which became final on January 2, 2008. Koob Decl., Jan. 12, 2010, Ex. A, Dkt. No. 115–2 ("Settlement Agreement"); *Hilton v. Wright*, 2008 WL 53670, No. 9:05–CV–1038 (N.D.N.Y. Jan. 2, 2008). The Settlement Agreement resolved all of the class's injunctive and equitable claims. It permanently eliminated the ASAT Requirement and provided steps to identify and treat those prisoners that had been previously denied HCV treatment because of their failure to satisfy the ASAT Requirement. The Settlement Agreement also created a two year monitoring period for defendants' compliance[12] and set forth payment to class counsel for that period. Fees for the monitoring period were capped at $20,000.00, subject to upward adjustment within the trial court's discretion. Finally, the plaintiff class was denied permission to move to amend their complaint to assert a class claim for damages. *Id.*

On April 17, 2009, defendants moved for summary judgment dismissing the individual plaintiffs' claims for damages. Plaintiffs opposed and defendants replied. The motion was considered on its submissions without oral argument. On December 14,

---

**12.** The parties agreed that the Settlement Agreement would be in effect for two years from the date it was executed. Thus, the terms and conditions of the Settlement Agreement were set to expire and all equitable

claims on behalf of plaintiffs discontinued and dismissed with prejudice in July 2009 unless the parties either agreed to voluntarily extend the Settlement Agreement or if extension was ordered by the court.

2009, an Order was issued granting defendants' motion for summary judgment and dismissing the Amended Complaint in its entirety. It was found that because plaintiffs were subject to only three and four month delays in receiving HCV treatment based on the ASAT Requirement, they could not demonstrate they suffered a serious injury and their Eighth Amendment claim could not survive. It was also determined that Dr. Wright was entitled to qualified immunity, and that plaintiffs' Title II and Section 504 claims had to be dismissed because Dr. Wright did not consider either plaintiff disabled. Hilton appealed and Vasquez settled.

Plaintiffs thereafter filed a motion for attorneys' fees, requesting $20,000.00 in fees and $17,385.45 in expenses for a total award of $37,385.45.[13] Defendants opposed in part and plaintiffs replied. The motion was considered on its submissions without oral argument. On May 25, 2010, an Order was issued awarding attorneys' fees in the sum of $23,152.00, finding it appropriate to enlarge the $20,000.00 cap but denying expenses because the Settlement Agreement made no provision for the payment of costs incurred by the plaintiff-class during the two year monitoring period. Dkt. No. 121. Hilton appealed.

On March 9, 2012, the Second Circuit Court of Appeals issued a decision regarding both of Hilton's appeals. *Hilton v. Wright*, 673 F.3d 120 (2d Cir.2012) (per curiam). The decision vacated the December 14, 2009 grant of summary judgment to defendants and remanded the case in accordance with the Second Circuit's opinion. The Court also vacated that part of the May 25, 2010 Order denying plaintiffs' application for expenses and remanded the issue for it to be determined whether to grant, fully or partially, the application for

such expenses. The corresponding Mandate was issued on April 20, 2012.

In accordance with the Order and Mandate, the December 14, 2009 Judgment in defendants' favor will be vacated and the May 25, 2010, Order denying plaintiffs' costs will be vacated. Upon remand, the parties filed supplemental briefs relating to the issues discussed in *Hilton*, 673 F.3d 120. The matter has now been briefed and is ready for consideration.

### III. GENERAL STANDARDS

#### A. Summary Judgment

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Fed. R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. at 2511. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir.2005). The non-moving party

---

**13.** The additional out-of-pocket expenses were mostly incurred paying an assistant whom plaintiffs' firm hired to enter data and manage correspondence with the inmates in the course of coordinating relief under the Settlement Agreement.

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356. There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. at 2510; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356.

## B. *Capacity of Claims against Dr. Wright*

▆▆▆ At the outset, it should be noted that the Amended Complaint is silent as to the capacity in which Dr. Wright is sued. "The distinction [between official and individual capacity suits] hinges upon from whom the plaintiff seeks a remedy." *Yorktown Med. Lab., Inc. v. Perales*, 948 F.2d 84, 87 (2d Cir.1991). Often, the course of proceedings indicates the nature of the liability to be imposed. *Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 252 (2d Cir. 1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)).[14] "Official capacity suits seek, in all aspects other than the party named as defendant, to impose liability on the government. Personal capacity suits, in contrast, aim to impose liability directly on officials for actions taken under color of state law." *Yorktown Med. Lab., Inc.*, 948 F.2d at 87. Thus, the real party in interest in any official capacity suit against Dr. Wright is DOCCS, the government entity. For the purposes of this motion, it will be assumed that plaintiff intended to assert claims against Dr. Wright in both his official and individual capacities.

## C. *Sovereign Immunity*

▆▆▆ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *State Emp. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir.2007) (citing U.S. Const. amend. XI). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001). However, this guarantee is not absolute. "Congress may abrogate the 'immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.'" *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 108 (2d Cir.2001) (quoting *Garrett*, 531 U.S. at 363, 121 S.Ct. at 962). Specifically, under section five of the Fourteenth Amendment, Congress may abrogate Eleventh Amendment immunity to enforce the substantive rights guaranteed by the Fourteenth Amendment. *Bolmer v. Oliveira*, 594 F.3d 134, 146 (2d Cir.2010).

## IV. *DISCUSSION*

Dr. Wright and DOCCS argue they are entitled to summary judgment dismissing all claims because: (1) any delay in plaintiff's HCV treatment did not cause him injury and disagreement with prison officials regarding his course of treatment does not constitute deliberate indifference; (2) plaintiff waived any claim relating to

---

14. The proceedings and the motion papers suggest that plaintiff intended to sue Dr. Wright in both his official and individual capacities. For example, the parties litigate the doctrine of qualified immunity on plaintiff's

deliberate indifference claim, which only relates to Dr. Wright's individual capacity. However, with respect to the Title II and Section 504 claims, the parties argue as to Dr. Wright's official capacity.

the July 2003 denial of treatment based on the Length of incarceration Requirement; (3) Dr. Wright is entitled to qualified immunity; (4) plaintiff cannot maintain a cause of action under the Title II nor Section 504 against Dr. Wright; (5) Eleventh Amendment immunity shields DOCCS from liability under Title II; (6) plaintiff is not "disabled" as defined by Title II nor Section 504; (7) plaintiff cannot show causation on any of his claims; and (8) the record does not support a recovery of compensatory nor punitive damages.

### A. Section 1983 Claim: Dr. Wright

Dr. Wright contends the first cause of action against him must be dismissed because it cannot be established that he was deliberately indifferent to Hilton's serious medical needs. In the alternative, Dr. Wright contends he is entitled to qualified immunity. Plaintiff asserts that there are disputed issues of fact and thus summary judgment should be denied on both the deliberate indifference claim and qualified immunity.

#### 1. Capacity

 First, to the extent plaintiff asserts a deliberate indifference claim against Dr. Wright in his official capacity, that claim must be dismissed because it is barred by the Eleventh Amendment. Such a claim against Dr. Wright in his official capacity would seek to impose liability on the government. Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598,

604, 46 L.Ed.2d 561 (1976) (quoting 42 U.S.C. § 1983). It is well-settled that states and governments are not "persons" under § 1983 and, therefore, Eleventh Amendment immunity is not abrogated by § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).[15] Thus, the deliberate indifference claim against Dr. Wright in his official capacity will be dismissed and will remain against Dr. Wright in his individual capacity subject to the analysis below.

#### 2. Merits of Eighth Amendment Claim

Hilton contends Dr. Wright violated his Eighth Amendment right to receive adequate medical care for HCV by implementing the Length of incarceration Requirement and the ASAT Requirement, which resulted in plaintiff being denied treatment.

 The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Through the prohibition on cruel and unusual punishment, the Eighth Amendment guarantees a prisoner medical treatment for serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Therefore, deliberate indifference by the government to such serious medical needs violates the Constitution. *Id.* at 104–05, 97 S.Ct. 285. A *deliberate indifference claim must include* both an objective and a subjective component; a plaintiff must satisfy both components to prevail. *Chance v. Armstrong*,

---

**15.** A state official sued in his official capacity for injunctive relief would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Graham*, 473 U.S. at 167, n. 14, 105 S.Ct. at 3106, n. 14. However, all claims for injunctive relief in this case were resolved by the Settlement Agreement. The only claims that remain are those for money damages.

143 F.3d 698, 702 (2d Cir.1998). First, a plaintiff must show that "his medical condition is objectively a serious one." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir.2003). Second, a plaintiff must show that the defendant acted with deliberate indifference to his medical needs. *Id.*

#### a. *Serious Medical Condition*

The objective component requires that "the deprivation alleged must be, objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (quotations omitted). Analyzing the objective element of a deliberate indifference claim requires two inquires. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." *Jones v. Westchester Cnty. Dep't of Corrs.*, 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

The second inquiry of the objective component is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The focus of this inquiry depends on whether the prisoner claims he was completely deprived of treatment or whether he claims the treatment he received was inadequate. *Id.* When the alleged deprivation is that the defendant failed to provide

*any* treatment for the medical condition, "courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A medical need is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance*, 143 F.3d at 702 (quotations omitted). If the claim is that treatment was provided, but that the treatment was inadequate, the inquiry is narrower. *Salahuddin*, 467 F.3d at 280. For example, if the claim is that treatment was delayed or interrupted, courts must focus on the challenged delay or interruption, rather than the severity of the prisoner's underlying medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir.2003).

The parties disagree over the characterization of the objective component here. According to plaintiff, this is a case of denied medical treatment, and thus the "serious" inquiry goes to the seriousness of his medical condition. Defendants characterize this as a case of delayed medical treatment—because Hilton was eventually provided treatment after the commencement of this lawsuit—thus the "serious" inquiry goes to the seriousness of his injury resulting from the delay.

Dr. Wright's conduct is appropriately characterized as a complete deprivation.[16] Plaintiff was denied treatment in 2003 based on the Length of incarceration Requirement and again in 2005 based on the ASAT Requirement. Hilton only eventually received HCV treatment due to the commencement of this lawsuit. Because the alleged deprivation is that defendants failed to provide *any* treatment for Hilton's medical condition, the focus must be on the nature of his medical condition. It is well-established that HCV is a serious medical condition.[17] *See, e.g., Hatzfeld v.*

---

**16.** Notably, the Second Circuit explained: "To establish deliberate indifference, Hilton must show that Dr. Wright harbored the requisite mental state while he *denied* Hilton

treatment." *Hilton*, 673 F.3d at 127 (emphasis added).

**17.** Moreover, the Second Circuit noted that "[n]o party disputes that Hilton's medical

*Eagen,* 9:08–CV–283, 2010 WL 5579883, at *10 (N.D.N.Y. Dec. 10, 2010) (Homer, M.J.) (collecting cases) Report–Rec adopted by 2011 WL 124535 (N.D.N.Y. Jan. 14, 2011) (Strom, S.J.). Accordingly, Hilton has satisfied the objective component and shown that "the inadequacy in medical care [was] sufficiently serious." *Salahuddin,* 467 F.3d at 280. It must be determined whether Dr. Wright's response (or lack thereof) to plaintiff's serious medical need constituted deliberate indifference.

### b. *Deliberate Indifference*

■■■■ To satisfy the subjective prong of an Eighth Amendment claim, an inmate must demonstrate that the defendant acted with the requisite culpable mental state, that is, with reckless disregard to a known substantial risk of harm. *Farmer,* 511 U.S. at 836, 114 S.Ct. at 1978. " 'Deliberate indifference' is 'a mental state more blameworthy than negligence'—it is 'a state of mind that is the equivalent of criminal recklessness.' " *Kelsey v. City of N.Y.,* 306 Fed.Appx. 700, 702 (2d Cir.2009) (summary order) (quoting *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003)). As the Second Circuit pointed out here, "it need not be shown that Dr. Wright intended for Hilton to suffer harm, but Dr. Wright's actions in this regard must have been more than merely negligent." *Hilton,* 673 F.3d at 127.

■■■■ To establish deliberate indifference, a plaintiff must prove that (1) the defendant medical provider was aware of facts from which the inference could be drawn that the plaintiff had a serious medical need; and (2) the defendant medical provider actually drew that inference. *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979. The plaintiff must then demonstrate that the defendant medical provider consciously and intentionally disregarded or ignored needs were serious." *Hilton,* 673 F.3d at

that serious medical need. *Id.* at 835–36, 114 S.Ct. at 1978. "Prison officials may, of course, introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.' " *Salahuddin,* 467 F.3d at 281 (quoting *Farmer,* 511 U.S. at 844, 114 S.Ct. at 1982). A jury could find a defendant lacking the requisite culpable state of mind if the jury accepted "that the defendant denied the plaintiff medical treatment 'because the defendant[ ] sincerely and honestly believed . . . that applying [a prison policy mandating the denial of treatment] was, in plaintiff's case, medically justifiable.' " *Id.* (quoting *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005)).

■■■■ Thus, the issue is not whether a medical policy is generally justifiable, "but whether a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." *Johnson,* 412 F.3d at 404. In *Johnson,* the Second Circuit held that the denial of HCV treatment based solely on an inmate's failure to fulfill the ASAT Requirement could create a triable issue of fact in three circumstances:

(1) [W]here there is consensus among the prisoners' medical providers that treatment is necessary regardless of the prerequisite, (2) where prison officials fail to determine whether the justifications for the ASAT prerequisite apply to the individual patient, and (3) where prison officials "reflexively" rely on the purported soundness of the guideline itself, even where they are on notice that a departure might be medically appropriate.

*Ippolito v. Goord,* No. 05–CV–6683, 2012 WL 4210125, at *13 (W.D.N.Y. Sept. 19, 127.

2012) (quoting *Johnson,* 412 F.3d at 404–06).

Dr. Wright asserts the ASAT Requirement had a rational basis and was properly applied in Hilton's case. He contends the Guidelines were developed after considering national guidelines, consensus statements, and recommendations, along with peer-reviewed medical journals which all supported the belief that substance abuse treatment and abstinence were critical to the success of combination therapy.

Although the majority of the parties' initial briefing focused on Dr. Wright's denial of HCV treatment based on Hilton's failure to satisfy the ASAT requirement during his final term of incarceration, the denial of treatment based on the Length of incarceration Requirement must also be considered.

### i. *July 2003 Denial*

 In its decision, the Second Circuit noted "it appears from Hilton's brief that he is now alleging that his Eighth Amendment rights were violated not only by the [ASAT] Program Requirement, but also by DOCS's policy of denying HCV treatment to certain prisoners whose expected prison terms are less than fifteen months." *Hilton,* 673 F.3d at 128. The Second Circuit further explained that Hilton did not raise the issue in the Amended Complaint because he only learned for the first time through the defendants' Statement of Material Facts in support of summary judgment that the fifteen-month minimum was the basis for denying him treatment in 2003 and 2004. The Second Circuit then instructed, upon remand, to consider whether this claim had been waived, and if it was not waived, to decide it. As the Court indicated, "[w]hen the district court is briefed on an issue that can be understood as implicit in the larger challenge, the opposing party does not argue waiver, and the district court considers the issue,

then that issue is not waived." *Id.* (citing *Dickerson v. Napolitano,* 604 F.3d 732, 741 (2d Cir.2010)).

Hilton did not allege in the Amended Complaint that the July 2003 denial based on the Length of incarceration Requirement violated his Eighth Amendment rights. However, he raised the issue in opposition to defendants' motion for summary judgment. Plaintiff admitted that "[a]lthough plaintiffs' pleadings focused primarily on the ASAT requirement because it is what led to their denials of treatment at immediate issue at the time of filing, the complaint also raised other failings in defendant's guidelines for the delivery of medical care to HCV infected prisoners." Pls.' Opp'n to Summ. J. at 13. In their reply papers, defendants objected to the belated allegation, asserting that the Amended Complaint did not raise any allegation of wrongdoing involving Dr. Wright prior to August 2004. Defendants further asserted that if plaintiffs were allowed to proceed with the pre-August 2004 events, they would be unduly prejudiced without the opportunity to conduct discovery on the additional claim.

Following the Second Circuit's instruction to consider whether the claim was waived, defendants again objected and asserted that plaintiff was provided a copy of his prison medical records ten months before the summary judgment motion, which indicated that when considering HCV treatment for him, DOCCS staff reviewed his release date and upon discovering that he was available for early release, decided his treatment would be provided after his release into the community. Plaintiff contends defendants cannot show they would be prejudiced by the addition of this claim and any assertion that plaintiff should have known of the claim at an earlier point is irrelevant.

 Under Federal Rule of Civil Procedure 15(b), a district court may consider

claims outside those raised in the pleadings so long as doing so does not cause prejudice. *See* Fed.R.Civ.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings."); *see also Jund v. Town of Hempstead,* 941 F.2d 1271, 1287 (2d Cir.1991) (refusing to exclude claims not alleged in pleadings because claims had been addressed on the merits both on summary judgment and at trial). In opposing a Rule 15(b) amendment, "a party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory. Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case." *N.Y.S. Elec. & Gas Corp. v. Sec'y of Labor,* 88 F.3d 98, 104 (2d Cir.1996).

 Defendants assert they would be unduly prejudiced without the opportunity of conducting discovery on this claim. Discovery proceeded with the focus of litigation on the ASAT Requirement.[18] The majority of the parties' expert submissions and other testimony centers around the medical reasons in support of, and in opposition to, the ASAT Requirement. It was not until defendants' motion for summary judgment did plaintiff argue this claim. In response to the new allegation, defendants did not defend the claim on the merits but instead argued the claim was not preserved. *Contra Jund,* 941 F.2d at 1287 (finding claims had been addressed on the merits at summary judgment). Further, in *Jund,* the plaintiff sought to add evidence of events alleged to have occurred after the service of the amended complaint. The Court found that "the claims arise out of the scheme that was the focus of the pleadings, the claims are directly related to the earlier violation, and there was no undue prejudice to the defendants." *Id.* By contrast here, any claim arising from the 2003 denial based on the Length of incarceration Requirement is not part of the same scheme as the denial based on the ASAT Requirement. Instead, the claims involve two entirely different requirements.

This matter is also distinguishable from *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 568–70 (2d Cir.2000), on which plaintiff relies. In that case, the Second Circuit affirmed the district court's consideration of an unpleaded hostile work environment claim raised in summary judgment proceedings where defendants objected but failed to demonstrate any prejudice. In that case, although the complaint did not refer specifically to "hostile work environment harassment," it described the plaintiff's harassment in enough detail to put the court and the parties on notice to the claim. *Id.* at 568. The Court "acknowledge[d] that [while] Cruz might have stated her claim of hostile work environment harassment more artfully, the essential elements of the charge do appear in the complaint." *Id.* at 569. Here, the issue is not that plaintiff failed to include a title to his cause of action or lacked the proper description of his claim. Instead, the Amended Complaint wholly fails to include any facts based on the Length of incarceration Requirement. There are no facts in the Amended Complaint which could put the court nor the defendants on notice that the Length of incarceration Requirement gave rise to an Eighth Amendment deliberate indifference claim.

Thus, any Eighth Amendment claim based on DOCCS' initial denial of treat-

---

18. Had defendants been on notice of a claim based on the Length of incarceration Requirement, they may have produced discovery demonstrating that an individualized assessment was conducted to determine Hilton's actual chances of parole. *See, e.g., Salahuddin,* 467 F.3d at 281.

ment in 2003 due to plaintiff's short prison term has been waived. While plaintiff may not pursue this claim as an independent basis for relief, evidence that DOCCS and/or Dr. Wright were aware of his HCV status in 2003 and evidence that he was denied treatment at that time may be relevant in determining what Dr. Wright knew about Hilton's conditions and medical history when he denied HCV treatment in 2005 based on the ASAT Requirement.

### ii. *May 2005 Denial*

 Dr. Wright insists the application of the ASAT Requirement to plaintiff was medically justified because plaintiff had a history of drug and alcohol use. While defendants have proffered evidence demonstrating that active alcohol and drug use increase the dangerousness of HCV treatment as well as decrease the effectiveness of such treatment, that evidence relates to *active* alcohol and drug use. Moreover, the applicable Guidelines stated that to qualify for HCV treatment, there must be "[n]o evidence of active substance abuse (drug and/or alcohol) *during the past 6 months.*" *See* ASAT Requirement (emphasis added). Hilton began his final period of incarceration on August 18, 2004. Therefore it is impossible for Dr. Wright, in May 2005, to have found that plaintiff used alcohol or drugs during the past six months as he was in DOCCS custody for the preceding nine months, and it is undisputed that plaintiff never used illegal drugs while incarcerated by DOCCS. Moreover, while Hilton self-reported in August 2004 during intake at Downstate that he had abused alcohol, any alcohol use would have been beyond the six month Guidelines period by the time Hilton was denied treatment in May 2005. It is undisputed Hilton admitted to using marijuana as a teenager and trying cocaine once, and admitted to drinking alcohol in the 1970s or 1980s. None of this conduct could qualify to preclude Hilton from receiving HCV treatment based on the ASAT Requirement.

Based on these facts, Dr. Wright failed to determine whether the justifications for the ASAT Requirement applied specifically to plaintiff. This is particularly incredible in light of the July 20, 2004, Guidelines update which provided that, in cases where an inmate would otherwise qualify for HCV treatment except for evidence of substance abuse, "[t]he incident will be evaluated individually to determine what it consisted of and whether or not it results in temporary disqualification for treatment." *See* ASAT Requirement. There is no evidence Dr. Wright inquired into plaintiff's alcohol or drug use history to determine whether the ASAT Requirement should be applied in plaintiff's case. Moreover, according to plaintiff's expert Dr. Carroll B. Leevy, M.D., the NIH recommended treatment be commenced for all people testing positive for HCV, even those actively abusing alcohol or drugs. Instead, Dr. Wright reflexively relied on the Guidelines. Finally, based on what Dr. Wright knew about plaintiff's medical condition (that he was diagnosed in 1999 and that his liver biopsy showed stage 2 or more advanced fibrosis) and how long he had been denied HCV treatment (allegedly at least since his incarceration in 2003), there are issues of fact as to what Dr. Wright knew about the likely medical consequences of continuing to deny plaintiff HCV treatment. By 2002, medical research and literature was clear that HCV was a progressive disease that could lead to serious harm including cirrhosis of the liver, and death. As Chief Medical Officer of DOCCS and the person responsible for promulgating and implementing the Guidelines, Dr. Wright was well aware of the risks occasioned by denying HCV treatment.

The denial of HCV treatment based only plaintiff's failure to complete the ASAT

Requirement creates a triable issue of fact as to whether the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs. *See Johnson,* 412 F.3d at 404. Dr. Wright points to no evidence that is sufficient to establish as a matter of law the propriety of conditioning HCV treatment on Hilton's satisfaction of the ASAT Requirement, simply because he had a history—however far removed or minimal—of alcohol or drug use. A reasonable jury could conclude that Dr. Wright promulgated an ambiguous set of Guidelines that resulted in the denial of necessary medical care to plaintiff without justification.[19]

### 3. *Qualified Immunity*

▆▆▆▆ The doctrine of qualified immunity protects state actors from liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). In determining whether a right was clearly established, courts look to whether: "(1) the right was defined with reasonable clarity; (2) Supreme Court or Second Circuit precedent has confirmed the existence of the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Turkmen v. Ashcroft,* 915 F.Supp.2d 314, 336–37, No. 02–CV–2307, 2013 WL 153158, at *12 (E.D.N.Y. Jan. 15, 2013) (citing *Young v. Cnty. of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). A convicted prisoner's right not to be recklessly denied treatment for a serious medical condition was clearly established at the time these events transpired. *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290.

---

**19.** Finally, to the extent the July 2005 denial of treatment could be viewed as giving rise to a separate claim for deliberate indifference based on the ASAT Requirement, such claim would also survive summary judgment. At that time, Dr. Wright denied HCV treatment based primarily on the lack of records relating to Hilton's prior HCV treatment, although Hilton disputes that he was advised of this reason. Dr. Wright also cited plaintiff's failure to complete the ASAT Requirement.

Dr. Wright asserts it was not clear from the Bellevue records whether Hilton was a relapser or a non-responder. According to defendants' expert, Dr. John B. Rodgers, M.D., a patient's likelihood of a relapse depends upon many individualized factors including the virus genotype, ethnicity, gender, age, the duration of their disease, and alcohol use. Dr. Rodgers testified that the success rate for treatment of HCV genotype 1 is approximately 50%, but drops to 19% in African American males such as plaintiff. By contrast, genotypes 2 and 3 achieve a sustained response rate of 70–80%. Plaintiff disputes these statistics. According to Dr. Leevy, racial disparities may reflect differences in social class, healthcare access, and quality of care, and a more recent study found a 29% success rate in African American males with genotype 1.

Dr. Rodgers and Dr. Wright further explained that it was important to know, if plaintiff was to be retreated for HCV, what his tolerance and compliance were, the side effects he previously encountered, and whether the risks outweighed the benefits. Plaintiff disputes the importance of the Bellevue records and asserts that it was known in 2002 that patients who fail to complete a full course of therapy often benefit from the repeat administration of combination therapy for the full course of treatment. Hilton also contends that any potential complications could have been closely monitored and addressed in DOCCS, and therefore possible side effects should not have been a deterrent to treatment.

Accordingly, there are disputed issues of fact regarding the relevance of past treatment and the likelihood of success for repeat treatment. A reasonable jury could find that Dr. Wright was deliberately indifferent in July 2005 by again reflexively relying on the ASAT Requirement to deny treatment as well as summarily denying treatment based on incomplete medical records without inquiring further into plaintiff's prior HCV treatment.

Even if the right was clearly defined, qualified immunity might still be available as a bar to a plaintiff's suit if the government official "can establish that it was *objectively reasonable* for them to believe their actions were lawful at the time," *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (emphasis added), or in other words, "for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir.2004). A government official's actions are *objectively unreasonable* "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir.1995) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Because the right in question here was clearly established, Dr. Wright will only be entitled to qualified immunity if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful. When "there are facts in dispute that are material to a determination of reasonableness," summary judgment on the basis of qualified immunity is inappropriate. *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999).

Dr. Wright argues the Guidelines were substantiated by medical literature and research and have evolved since their inception in 1999. Therefore he contends it was objectively reasonable for him to rely on the Guidelines in denying plaintiff HCV treatment based on the ASAT Requirement. Given that there are disputed issues of fact which could lead a reasonable jury to find that Dr. Wright was deliberately indifferent to plaintiff's serious medi-

cal needs by conditioning HCV treatment on his satisfaction of the ASAT Requirement, and moreover, conflicting expert testimony as to whether the ASAT Requirement comported with accepted medical standards at the relevant time, there are issues of fact as to whether Dr. Wright's denial of treatment, until forced by litigation, was objectively reasonable conduct. Qualified immunity will therefore be denied without prejudice.

### B. Americans with Disabilities Act Claim: Dr. Wright and DOCCS

In the second cause of action, plaintiff alleges that Dr. Wright and DOCCS violated Title II of the ADA. Specifically, plaintiff contends that he was regarded as a past drug or alcohol user and denied HCV treatment because of that claimed disability based on the ASAT Requirement. Defendants contend plaintiff is not disabled within the meaning of the statute.

#### 1. Capacity

Any ADA claim against Dr. Wright in his individual capacity must be dismissed because he is an individual, not a public entity. *See Green v. City of N.Y.*, 465 F.3d 65, 76 (2d Cir.2006); 42 U.S.C. § 12131(1). Insofar as plaintiff is suing Dr. Wright in his official capacity, he is seeking damages from New York, and the Eleventh Amendment therefore shields him to the same extent that it may shield DOCCS. Dr. Wright will remain as a defendant in his official capacity subject to the below analysis.

#### 2. Merits of Title II Claim [20]

Title II of the ADA prohibits disability discrimination by public entities

---

**20.** "While courts normally consider Eleventh Amendment issues before the merits, in the ADA context, an examination of the merits is the first step of the Eleventh Amendment analysis." *Elbert v. N.Y.S. Dep't of Corr.*, 751 F.Supp.2d 590, 596 n. 5 (S.D.N.Y.2010) (citing *United States v. Georgia*, 546 U.S. 151, 159, 126 S.Ct. 877, 882, 163 L.Ed.2d 650 (2006)).

at the local and state level. 42 U.S.C. § 12132. That section provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* To prove a violation under Title II, a plaintiff must show that: he is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12102; he is being excluded from participation in or being denied benefits of some service, program or activity by reason of his disability; and the entity which provides the service, program or activity is a public entity. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003).

█ The term "disability" with respect to an individual, means "a physical or mental impairment that substantially limits one or more major life activities of such individual"; "a record of such impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). For purposes of "being regarded as having such an impairment," an individual need only establish "that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3).[21] Thus, Hilton need only "raise a genuine issue of material fact about whether Dr. Wright and/or DOCS regarded him as having a mental or physical impairment." *Hilton,* 673 F.3d at 129. He is "not required to present evidence of how or to what degree they believed the impairment affected him." *Id.*

█ Following the ADA's passage in 1990, Congress charged the United States Department of Justice with issuing regulations implementing Title II of the ADA. *See* 42 U.S.C. § 12134(a). Those regulations currently include "drug addiction" and "alcoholism" among the conditions qualifying as a "physical or mental impairment." 28 C.F.R. § 35.104(ii) (2012). While the regulations "have not tracked the ADA Amendments Act of 2008, and continue to define disability as Section 12102 did before the Amendments," *Hilton,* 673 F.3d at 129, n. 8, the regulations are still entitled to substantial deference. *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982) ("[T]he interpretation of [the] agency charged with the administration of [this] statute is entitled to substantial deference."). "Unless the regulations are 'arbitrary, capricious or manifestly contrary to the statute,' the agency's regulations are 'given controlling weight.'" *Helen L. v. DiDario,* 46 F.3d 325, 332 (3d Cir.1995) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). Neither party has demonstrated that the regulations are arbitrary, capricious or manifestly contrary to the ADA Amendments Act of 2008, and thus the definitions found in Section 35.104 of Title 28 of the Code of Federal Regulations are persuasive.

█ There is no dispute that defendants regarded Hilton as a former drug and alcohol user. *Hilton,* 673 F.3d at 129. Thus, there is an issue of fact as to whether defendants regarded Hilton as having a

---

**21.** In 2008, Congress passed the ADA Amendments Act, which revised the language of § 12102. One major change involved the definition of "regarded as" disabled. The new definition, stated above, was implemented to restore Congress's original intent that individuals need only show that the discriminatory action "'was taken because of an actual or perceived impairment, *whether or not* that impairment actually limits *or is believed* to limit a major life activity.'" *Hilton,* 673 F.3d at 129 (quoting H.R. Rep. No. 110–730, pt. 1, at 14 (2008) (emphasis added)).

"drug addiction" or "alcoholism," which would constitute a physical or mental impairment for purposes of being regarded as disabled under § 12102. *Id.* As to the remaining elements Hilton must prove to sustain a Title II claim, it is undisputed he was denied HCV treatment by reason of his past alcohol and/or drug use. Finally, a "public entity" includes "any State or local government" and "any department, agency, ... or other instrumentality of a State." 42 U.S.C. § 12131(1). This term includes state prisons. *Georgia,* 546 U.S. at 154, 126 S.Ct. at 879.

Defendants' request for summary judgment dismissing the Title II claim will be denied because there is a genuine issue of material fact as to whether defendants regarded Hilton as disabled and plaintiff has satisfied the remaining elements of a Title II claim.

### 3. *Sovereign Immunity*

Defendants argue that Eleventh Amendment immunity limits their liability for money damages under Title II of the ADA.

Congress unambiguously expressed its intent to abrogate states' immunity from claims under Title II. *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."). However, "[t]he extent to which Congress's abrogation is a constitutional exercise of its section five authority has been the subject of much debate." *Bolmer,* 594 F.3d at 146.

In *Garcia,* the Second Circuit explained that under section five of the Fourteenth Amendment, Congress may prohibit conduct which actually violates the Fourteenth Amendment, as well as "a somewhat broader swath of conduct" that is constitutional but which Congress may prohibit in order to remedy or deter actual

violations. *Garcia,* 280 F.3d at 108 (quotations omitted). The Second Circuit found that in enacting Title II, Congress had exceeded its authority under section five. *Id.* at 109–10. Despite this, sovereign immunity may still be abrogated under Title II if a plaintiff can establish "that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111. "Government actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment—i.e., conduct that is based on irrational prejudice or wholly lacking a legitimate government interest." *Id.*

The Supreme Court later reaffirmed that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia,* 546 U.S. at 159, 126 S.Ct. at 882. In *Georgia,* the plaintiff asserted claims under Title II based on the state prison's alleged failure to accommodate his needs, including his medical needs. *Id.* at 157, 126 S.Ct. at 881. He alleged that same conduct violated the Eighth Amendment proscription against cruel and unusual punishment. *Id.* at 157, 126 S.Ct. at 880. In determining that sovereign immunity was abrogated on those facts, the Supreme Court found that the Title II claims "were evidently based, at least in large part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment [incorporating the Eighth Amendment's prohibition against cruel and unusual punishment]." *Id.* at 157, 126 S.Ct. at 881. *Georgia* left open the question of whether Title II validly abrogates sovereign immunity for conduct that violates Title II but does not violate the Constitution. *Id.* at 159, 126 S.Ct. at 882.

The Second Circuit again considered the issue in 2010 in *Bolmer*, 594 F.3d 134. In that case, the Second Circuit clarified that *Garcia* and its discriminatory animus requirement were based on Congress's enforcement of the Equal Protection Clause. *Bolmer*, 594 F.3d at 146. The Court held that the additional showing of discriminatory animus or ill will based on the plaintiff's disability is not applicable when abrogation is supported by the enforcement of substantive due process rights, such as the right at issue in *Bolmer*—the right not to be involuntarily committed absent a danger to self or others. *Id.* at 147–48. The *Bolmer* Court concluded that the district court properly disregarded *Garcia* and decided the issue under *Georgia* since the claim was basely solely on substantive due process and not equal protection. *Id.* at 147. The Court declined to reach the question of whether or not *Garcia* survived *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (upholding abrogation in the context of courtroom accessibility on the basis that in enacting Title II, Congress sought to enforce not only equal protection, but also a variety of other basic constitutional guarantees) and *Georgia*. *See Bolmer*, 594 F.3d at 148.

What is clear, is that after *Georgia*, sovereign immunity will be abrogated under Title II when a plaintiff can demonstrate an actual Fourteenth Amendment violation. Here, like in *Georgia*, Hilton alleges that the same conduct which violates Title II also violates the Eighth Amendment. As explained above, there are disputed issues of fact as to plaintiff's Eighth Amendment claim. Because it cannot be determined as a matter of law at this juncture whether there was a constitutional violation sufficient to abrogate sovereign immunity under Title II, defendants' sovereign immunity defense will be rejected without prejudice to renew at a later time.

### C. *Rehabilitation Act Claim: Dr. Wright and DOCCS*

In the third cause of action, plaintiff alleges that Dr. Wright and DOCCS violated Section 504 of the Rehabilitation Act. Specifically, plaintiff contends that he was regarded as a past drug or alcohol user and denied HCV treatment because of that claimed disability based on the ASAT Requirement. Defendants contend plaintiff is not disabled within the meaning of the statute.

#### 1. *Capacity*

█ First, any claim against Dr. Wright in his individual capacity must be dismissed because Section 504 does not provide for individual capacity suits against state officials. *Garcia*, 280 F.3d at 107; 29 U.S.C. § 794(a) (statute's non-discrimination requirements only apply to entities receiving federal funds). As for the claim against Dr. Wright in his official capacity and DOCCS, it is well-established that sovereign immunity has been validly abrogated under Section 504 and the claim may proceed subject to the analysis below. *See, e.g., Degrafinreid v. Ricks*, 417 F.Supp.2d 403, 414 (S.D.N.Y.2006) (holding that New York's continued acceptance of federal funds after *Garrett*, 531 U.S. 356, 121 S.Ct. 955 is a knowing relinquishment of its Eleventh Amendment immunity).

#### 2. *Merits of Section 504 Claim*

Similar to Title II, Section 504 prohibits discrimination against a qualified individual with a disability "solely by reason of her or his disability," in excluding them "from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The main difference between the statutes is that coverage under Rehabilitation Act is limited to entities receiving federal fi-

nancial assistance, while ADA's reach extends to private entities. When brought together, claims under Title II and Section 504 may be treated identically. *See Henrietta D.*, 331 F.3d at 272. Therefore, summary judgment on this claim will be denied for the same reason it will be denied on the Title II claim—there are disputed issues of fact as to whether defendants regarded plaintiff as disabled.

### D. *Award of Fees and Costs*

██ Class counsel's initial motion for attorneys' fees sought $20,000.00 in attorneys' fees and $17,385.45 in expenses for a total award of $37,385.45 for the two year monitoring period. An upward adjustment of the $20,000.00 cap was granted to account for the $23,152.00 in attorneys' fees actually incurred, and expenses were denied.

The Settlement Agreement states in relevant part:

Class Counsel will further be paid at a rate of $160 an hour for attorney time and $80 an hour for paralegal time for hours incurred during the two year monitoring period described herein. Fees for the herein described monitoring period will capped [sic] at $20,000. Class Counsel reserves the right to seek Court intervention to enlarge this limit upon a showing that such enlargement is reasonable to enforce the terms of this Agreement.

Settlement Agreement ¶ 6. The Second Circuit concluded that the language shows an intent to cap *all* reimbursement at $20,000.00 subject to the district court's discretion to enlarge the limit. *Hilton*, 673 F.3d at 130. Such reimbursement thus includes attorneys' fees, paralegal fees, and out-of-pocket expenses. The Second Circuit remanded the issue with instructions to decide whether the denied costs should be awarded pursuant to paragraph six of the Settlement Agreement. *Id.* at 130–31.

On appeal, plaintiff conceded that a substantial portion of the documented out-of-pocket expenses was for paralegal work. In fact, $15,230.00 of the requested $17,385.45 in expenses accounted for a paralegal and a consultant's work on the case. However, the $15,230.00 sought reflected the actual *cost* to plaintiff's law firm of employing the two individuals for 466.20 hours. As detailed by plaintiff, the two employees' work actually totals $37,296.00 in paralegal fees if calculated at the agreed upon billable rate of $80.00 an hour for paralegal work. It is clear that class counsel repackaged the paralegal work as an out-of-pocket expense, calculated only at cost to them. Despite labeling the paralegal work an "out-of-pocket expense," it must be calculated at the $80.00 an hour rate because there is no question that the Settlement Agreement covered paralegal fees.

In urging that an enlargement of the cap is reasonable, class counsel explained that at the time of the Settlement Agreement, they believed that defendants—who made all treatment decisions—would take on the primary responsibility of identifying those prisoners who had been denied treatment based on the ASAT Requirement. However, there was no central collection of the forms Dr. Wright used to notify facilities of HCV treatment denials based on the ASAT Requirement, and no other means of identifying those who were so denied because the records were maintained only in each individual prisoner's medical file. While DOCCS had a method of identifying those prisoners who had tested positive for HCV, they had no manageable way of separating out those who were denied treatment due to the ASAT Requirement. Due to privacy rights, DOCCS would not release the list of HCV

558

infected prisoners to class counsel. As class counsel explained,

> [t]he reason that the costs exceeded the parties' expectations arose as a result of apparent concerns by defendants as to privacy requirements. This unforeseen development led to defendants' complete reliance on plaintiffs' compilation of the class responses to the Notice to the Class for a determination of those class members entitled to injunctive relief.

Pls.' Mem. of Law in Supp. of Mot. for Att'ys Fees, at 9, Dkt. No. 115–12. Essentially, class counsel asserts they were responsible for identification of class members, in addition to monitoring defendants' compliance during the two year period.

Defendants dispute this contention and opposed the initial $37,385.45 request on the basis that the Settlement Agreement only provides for the award of fees for those hours incurred on behalf of inmates determined to be members of the class. Defendants contend the parties did not agree that there would be payment for hours spent determining which inmates comprised the class; instead payment was to be made for monitoring the class. Moreover, defendants allege the Settlement Agreement placed the burden upon them to seek out inmates to reevaluate for HCV treatment based upon the revised Guidelines, but there was no requirement to compile a list of actual class members. They note that class counsel never determined actual class members, only potential class members.

The Settlement Agreement permits enlargement of the $20,000.00 cap upon a showing that such enlargement is reasonable to enforce the terms of the Settlement Agreement. As the Second Circuit noted:

> Defendants also assert that Hilton's out-of-pocket expenses are unreasonable and pertain to work outside the scope of the Settlement Agreement. This argument is without merit. The Settlement Agreement expressly called for Hilton's lawyers to collect the questionnaires from potential class members, tabulate the information collected, and share a summary of the information with DOCS so that DOCS could ascertain a definitive class member list. Nearly all of Hilton's lawyers' out-of-pocket expenses were incurred complying with this provision of the Settlement Agreement.

*Hilton,* 673 F.3d at 130, n. 9. It is clear that class counsel incurred the documented fees and expenses in accordance with their responsibilities under the Settlement Agreement and in furtherance of the goals thereunder.

Class counsel has already been awarded $23,152.00 in attorneys' fees to account for the 144.70 hours spent by partners during the monitoring period. Now under consideration is whether to award any or all of the $17,385.45 "out-of-pocket expenses" initially sought by class counsel. While the documented paralegal fees would total $37,296.00 if calculated pursuant to the Settlement Agreement, class counsel only requested $15,230.00 for that work, plus $2,155.45 in other costs including rental of a United States postal box for class correspondence, copying and postage costs for class mailings, and Spanish translations of client correspondences.

Class counsel has demonstrated that an enlargement of the cap is appropriate, and as the Second Circuit noted, plaintiff's out-of-pocket expenses are reasonable. Therefore, class counsel's motion for attorneys' fees will be granted in full and class counsel will be awarded $15,230.00 for the paralegal work and $2,155.45 for other costs, for a total of $17,385.45. Thus, in addition to the $23,152.00 already awarded in attorneys' fees, defendants are ordered to pay class counsel $17,385.45. A total award of $40,537.45 is reasonable considering the time spent on this matter.

## V. *CONCLUSION*

Therefore, it is

ORDERED that

1. The December 14, 2009, Judgment dismissing the First Amended Complaint is VACATED;

2. That portion of the May 25, 2010, Order denying attorneys' fees beyond the sum of $23,152.00 is VACATED;

3. Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

· 4. Any claim relating to the 2003 denial of Hepatitis C treatment based on the Length of incarceration Requirement is WAIVED;

5. The following claims are DISMISSED:

(a) Section 1983 claim against Dr. Wright in his official capacity;

(b) ADA claim against Dr. Wright in his individual capacity; and

(c) Rehabilitation Act claim against Dr. Wright in his individual capacity;

6. Plaintiff's motion for attorneys' fees is granted and class counsel is awarded an additional $17,385.45, for a total fee award of $40,537.45;

7. Defendants are to make payment in the sum of $17,385.45 to "Koob & Magoolaghan" on or before March 25, 2013;

8. Upon the defendants' failure to make the above payment, the Clerk is directed to enter judgment in favor of the plaintiff class and against the defendants in the sum of $17,385.45; and

9. Trial is scheduled for August 12, 2013. Pre-trial papers are due by noon on July 26, 2013. ·

IT IS SO ORDERED.